913 So.2d 579 (2005)
Inquiry Concerning a Judge, No. 03-14, re: James E. HENSON.
No. SC04-1.
Supreme Court of Florida.
October 12, 2005.
*582 Honorable James R. Wolf, Chairman, Hearing Panel, Brooke S. Kennerly, Executive Director, Tallahassee, FL, Thomas G. MacDonald, Jr., General Counsel, Tampa, FL, E. Lanny Russell of Smith, Hulsey and Busey, Jacksonville, FL, for Florida Judicial Qualifications Commission, Petitioner.
Kirk N. Kirkconnell of Lindsey, Snure and Yates, P.A., Winter Park, FL, for Judge Henson, Respondent.
PER CURIAM.
Article V, section 12 of the Florida Constitution vests this Court with the authority to determine both whether a judge has engaged in misconduct and whether that misconduct justifies discipline or removal from office. This is a responsibility of the utmost importance to the integrity of the justice system. In this case we review the determination of the Hearing Panel of the Judicial Qualifications Commission (JQC) that Circuit Judge James E. Henson violated provisions of the ethics rules governing judges and attorneys in this state, and its recommendation that he be removed from office.
We conclude, based on the evidence presented to the Hearing Panel, that Judge Henson practiced law while still a judge and that, acting as an attorney between his terms of judicial service, he advised a client in a criminal matter to flee the country rather than face prosecution. We further conclude that these two extremely serious violations of the Code of Judicial Conduct and Rules of Professional Conduct constitute "conduct unbecoming a member of the judiciary demonstrating a present unfitness to hold" the position of judge. Art. V, § 12(c)(1), Fla. Const. Neither those who appear before Judge Henson nor the public at large can have confidence in a judge who has committed these flagrant violations of our ethics rules. We therefore remove Judge Henson from office.

I. FACTS AND PROCEDURAL HISTORY
The charges on which the Hearing Panel found Judge Henson guilty stem from conduct during his final weeks as a county judge in December 2000 and then into 2001 when he practiced law before returning to the bench as a circuit judge. Count I involves the allegation that Judge Henson practiced law while still a judge; Count II concerns the charge that he advised a client facing a felony trial to flee the country.
Judge Henson served as a county judge in Orange County but was defeated in a re-election bid. His term ended on January 5, 2001. He returned to the practice of law, doing criminal defense work. He won election to a new judicial post as a circuit judge, and assumed office on January 5, 2003. In the light most favorable to the findings of the Hearing Panel, the facts bearing on Judge Henson's misconduct are as follows:
Diana Jimenez was a Florida resident from Colombia who came to the United States with a valid Colombian passport. Ms. Jimenez was involved in a December 16, 2000, automobile accident in which two people were killed. She tested positive for *583 driving while intoxicated, and gave an incriminating videotaped statement in which she admitted drinking at a bar before the accident. The State charged Ms. Jimenez with DUI manslaughter and numerous related charges, for which she faced a prison sentence of more than thirty years. Her father, Dr. Alberto Jimenez, initially hired another attorney to represent her. After hearing favorable comments about Judge Henson and learning that he was a judge, Dr. Jimenez dismissed the lawyer he had hired and retained Judge Henson to represent his daughter. Judge Henson, who had been defeated in his re-election bid in November of 2000, had cleared his judicial calendar at the courthouse and had completed his judicial duties by December 15, 2000.
When he was first contacted by Dr. Jimenez, Judge Henson stated that he could not actively participate in the case until after his term as judge ended in January 2001. On December 20, 2000, Judge Henson and Dr. Jimenez signed a contract for Henson to represent Ms. Jimenez for $40,000, and Dr. Jimenez gave Judge Henson a check for the initial $15,000. Judge Henson then went to the county jail where Ms. Jimenez was in custody. He signed in as the attorney representing her and met with her. During this meeting, Ms. Jimenez also signed the contract and discussed with Judge Henson information for an upcoming bond hearing. This interview concerned the details of Ms. Jimenez's home and ties with the community. Judge Henson learned that Ms. Jimenez's Colombian passport was still valid and that she had several close relatives still living in Colombia. The subject of Ms. Jimenez fleeing to Colombia arose during several subsequent discussions. During a January 2001 trip to the bar to look for witnesses, Judge Henson asked Ms. Jimenez whether she still had her Colombian passport, and she said she did.
Judge Henson asked a fellow attorney, Robert Nesmith, to handle Ms. Jimenez's bond hearing because Judge Henson had a "conflict." Judge Henson introduced Nesmith to Ms. Jimenez at the bond hearing on December 22, 2000. Judge Henson sat in the audience with Dr. Jimenez. When the hearing ended, Judge Henson went forward to the bench and obtained papers from the presiding judge which were necessary to secure the bond. Judge Henson has admitted both the foregoing facts and that these facts demonstrate that he was improperly practicing law while still a judge.
Judge Henson contested the JQC's allegation in Count II that while representing Ms. Jimenez after he left the bench, he advised her to flee the United States. On this count, the Hearing Panel found:
The testimony on the issue of whether Judge Henson advised Diana Jimenez to avoid prosecution by fleeing to Colombia was in dispute. Judge Henson testified that although the subject of Colombia came up, he never advised or counseled Jimenez to flee. Judge Henson stated this position repeatedly throughout his testimony. However, Diana Jimenez, Dr. Alberto Jimenez and attorney Nesmith testified to facts supporting the charge and the Panel has rejected the testimony of Judge Henson and found the testimony of the other three witnesses on this issue to be credible and believable. The Panel is charged with the responsibility of resolving the conflicts in evidence. The Panel thus accepts the testimony of Diana Jimenez, Dr. Alberto Jimenez and Mr. Robert Nesmith and finds this testimony to be clear and convincing.
Diana Jimenez testified on video deposition and was subjected to cross examination by counsel for Judge Henson. *584 Diana Jimenez testified that although Judge Henson did not specifically tell her to flee to Colombia, that Judge Henson gave her to understand on more than one occasion that fleeing to Colombia was an option which she should consider. Diana Jimenez stated that she told Judge Henson that she did not wish to flee to Colombia and have to be looking over her shoulder for the rest of her life. She further stated that Judge Henson told her that Colombia had no extradition treaty and therefore she would not be the subject of a search by U.S. authorities in Colombia. She stated that he further told her that this was not the kind of charge on which a search would be mounted for her in a foreign country. Ms. Jimenez stated that Judge Henson was very interested in learning that she had a valid passport from Colombia and that she had close relatives in Colombia who would cooperate with her if she went there. He discussed this with her more than once [during] meetings in December, January and August.
There was disagreement between Judge Henson and Diana Jimenez concerning what plea offers were made by the State and when these offers were conveyed to Jimenez. The State initially offered a 10-12 year cap on a proposed negotiated plea. This offer to Henson occurred in May of 2001. . . . It was uncertain whether Henson clearly and directly conveyed this 10-12 year plea offer to Diana Jimenez. In any event, after the Assistant State Attorney discussed the case further with the family of the deceased victims, the 10-12 year plea offer was withdrawn and the 16 year offer was substituted. Diana Jimenez and her father did not believe Judge Henson was ready to defend her in a trial and she thus believed that he was actually counseling and advising her to flee and avoid prosecution and thereby avoid a trial. The plea hearing actually occurred on October 18, 2001, and Ms. Jimenez testified that Henson strongly urged her to take the 16 year offer and avoid going to trial. Due to the absence of clear evidence, the Panel has rejected the charge on Henson's failure to advise his client of the plea offer.
A meeting had occurred in August of 2001, in which Judge Henson, Dr. and Mrs. Jimenez and Diana Jimenez were in attendance and participated. There was conflicting testimony as to whether Judge Henson used the word "Colombia" during this meeting. Henson denied even using the word but all of the other witnesses testified that he did bring up the subject of "Colombia" and the subject of extradition in the August meeting.
Maria Jimenez was the mother of Diana Jimenez and she attended the August 2001 meeting. Maria Jimenez spoke very little English and a portion of her deposition was read over objection. She remembered that Judge Henson did use the word "Colombia" and this was one of the few words she understood.
Dr. Alberto Jimenez testified to numerous meetings and telephone conversations he had with Judge Henson regarding his daughter's criminal prosecution. The doctor testified that he attended the August 25, 2001, meeting where there were discussions regarding the State having made an initial plea offer, withdrawn it and then come back with a higher 16 year offer. Judge Henson said at that time that if they went to trial, Diana Jimenez would probably be sentenced to something in the vicinity of 35 years. Henson and Diana Jimenez both stated that at this point Diana Jimenez, who *585 was pregnant, began crying and became very emotional.
Dr. Jimenez testified that Judge Henson later called him on the phone and suggested that they could put Diana on a plane to Puerto Rico and then have her flown on to Colombia. Dr. Jimenez stated that he told Judge Henson that Colombia did have an extradition treaty and that Dr. Jimenez definitely wanted his daughter to go to trial and not to consider fleeing to Colombia. Dr. Jimenez stated that he remembered that at the meeting of August 25, 2001, his wife had asked him about Judge Henson's comments concerning extradition. . . .
. . . At some [time subsequent to the bond hearing handled by attorney Nesmith at Judge Henson's request], Judge Henson and Mr. Nesmith were occupying the same office area and Nesmith testified that Henson invited him into his office and told him that he had advised Diana Jimenez to avoid prosecution by fleeing to Colombia. Nesmith said that Henson prefaced his comments by telling Nesmith that he would deny it if Nesmith ever told anyone about his statements.
. . . [T]he Panel does accept Mr. Nesmith's testimony that Henson told him that he had advised Ms. Jimenez to flee to Colombia to avoid prosecution. This testimony was consistent with what all of the other witnesses testified to except for Judge Henson.
Findings, Conclusions and Recommendations of the Hearing Panel of the Judicial Qualifications Commission (hereinafter Findings) at 18-24.
The Hearing Panel concluded as to Count I that in practicing law while still a judge, Judge Henson violated Canons 1, 2, 3, and 5 of the Code of Judicial Conduct.[1] The Hearing Panel concluded as to Count II that, acting as an attorney, Judge Henson counseled Diana Jimenez to evade prosecution by fleeing the United States in violation of Rules 4-1.1, 4-1.2(d), 4-1.3, 4-1.4, 4-8.4(a), 4-8.4(b), and 4-8.4(c) of the Rules of Professional Conduct.[2] The Hearing Panel acquitted Judge Henson on several other charges which are not discussed herein. The Hearing Panel concluded that the two violations on which it found him guilty evidenced a "pattern of misconduct" involving improper representation in the Jimenez case which renders Judge Henson presently unfit to hold judicial office, and recommended his removal from the position of circuit judge.
This Court issued an order to show cause why the recommended action of removal should not be granted. In response, *586 Judge Henson argues that (1) the JQC and this Court lack subject-matter jurisdiction over the misconduct in Count I; (2) the finding of guilt for counseling Ms. Jimenez to flee the jurisdiction was not supported by clear and convincing evidence; (3) the Hearing Panel improperly considered acquitted conduct, uncharged misconduct, and inadmissible hearsay in reaching its decision and recommendation; (4) the Hearing Panel failed to consider evidence in Judge Henson's favor; and (5) a public reprimand is the most severe appropriate sanction for the misconduct actually committed.

II. ANALYSIS
Initially, we summarily reject Judge Henson's claims that the Hearing Panel's finding of guilt on Count II and recommendation of removal is tainted by improper considerations. Close examination of the Hearing Panel's Findings reflect that its conclusions both as to guilt and the recommended sanction rest solely on admissible evidence as to the two counts discussed herein. Similarly, in accepting the Hearing Panel's findings and recommendation, we confine our focus to the violations that were charged and proved. Below, we discuss in greater detail Judge Henson's jurisdictional argument on Count I, his argument that the evidence was insufficient to establish a violation as to Count II, and the question of the appropriate sanction.

A. Jurisdiction Over Misconduct During Previous Service as a Judge
Judge Henson's term as county judge ended in January 2001, and he assumed office as a circuit judge in January 2003. In January 2004, the JQC Investigative Panel brought formal charges in Count I against Judge Henson for practicing law in December 2000, before his term as county judge ended. Judge Henson moved to dismiss these charges on grounds that the JQC lacked subject-matter jurisdiction to institute proceedings more than a year after he left the county bench for conduct occurring during his term as county judge. He relied on language in article V, section 12(a)(1) of the Florida Constitution, which provides:
There shall be a judicial qualifications commission vested with jurisdiction to investigate and recommend to the Supreme Court of Florida the removal from office of any judge whose conduct, during term of office or otherwise . . . demonstrates a present unfitness to hold office. . . . The commission shall have jurisdiction over justices and judges regarding allegations that misconduct occurred before or during service as a justice or judge if a complaint is made no later than one year following service as a justice or judge.
The Chair of the Hearing Panel denied the motion to dismiss.
Judge Henson reprises his argument in this Court, asserting that under the time limit imposed by the Florida Constitution, the JQC lost jurisdiction over the conduct in Count I in January 2002, a year before the Investigative Panel filed formal charges. Judge Henson argues that the language in article V, section 12(a)(1) requires the JQC to begin proceedings no later than one year after the judge leaves the bench, regardless of whether the judge subsequently regains a judicial position. The JQC argues that it regained jurisdiction to pursue sanctions for Judge Henson's misconduct as a county judge when he returned to the bench as a circuit judge in January 2003. The JQC's position is that under article V, section 12(a)(1), a former judge's return to the bench revives jurisdiction to proceed against the judge *587 for misconduct during the previous judicial service.
The issue is the meaning of the language requiring that a complaint be made "no later than one year following service as a justice or judge." Art. V, § 12(a)(1), Fla. Const. To date, the provision, which was adopted by the voters in 1996, has been applied only to judges who retired or resigned from office during investigation, not to a judge who has left and then returned to the bench. See In re Frank, 753 So.2d 1228, 1230 (Fla.2000) (retirement from bench does not deprive Court of jurisdiction to sanction misconduct during term of service); In re Hapner, 718 So.2d 785, 787-88 (Fla.1998) (resignation of judge after formal charges filed does not deprive Court of jurisdiction to proceed). Thus, the applicability of the one-year limitation to a judge with an interrupted term of judicial service is a matter of first impression.
To determine the meaning of language in a constitutional provision, this Court follows principles parallel to those of statutory construction. See Zingale v. Powell, 885 So.2d 277, 282 (Fla.2004).
"[A]ny inquiry into the proper interpretation of a constitutional provision must begin with an examination of that provisions explicit language." Likewise, this Court endeavors to construe a constitutional provision consistent with the intent of the framers and the voters. . . .
The fundamental object to be sought in construing a constitutional provision is to ascertain the intent of the framers and the provision must be construed or interpreted in such manner as to fulfill the intent of the people, never to defeat it. Such a provision must never be construed in such manner as to make it possible for the will of the people to be frustrated or denied.
Moreover, in construing multiple constitutional provisions addressing a similar subject, the provisions "must be read in pari materia to ensure a consistent and logical meaning that gives effect to each provision."
Id. at 282-83 (quoting Caribbean Conservation Corp. v. Fla. Fish & Wildlife Conservation Comm'n, 838 So.2d 492, 501 (Fla.2003)) (citations omitted).
The explicit language of article V, section 12(a)(1) does not resolve the issue. Therefore, we must probe deeper to determine the intent of the framers and voters, and construe the language to fulfill, rather than frustrate or deny, the will of the people. In previous opinions, this Court has explained the policy rationale for imposing sanctions for judicial misconduct up to and including removal from office. The Court has stated that
[j]udges should be held to even stricter ethical standards [than attorneys] because in the nature of things even more rectitude and uprightness is expected of them. . . . The judge should observe high standards of conduct so that the integrity and independence of the judiciary may be preserved. He should conduct himself at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary.
In re LaMotte, 341 So.2d 513, 517-18 (Fla. 1977) (citation omitted). In removing a judge from office for engaging in a pattern of deceit and deception, the Court has explained that "[t]he judicial system can only function if the public is able to place its trust in judicial officers." In re Ford-Kaus, 730 So.2d 269, 277 (Fla.1999). Thus, the authority to investigate, determine, and sanction judicial misconduct contained in article V, section 12 is a mechanism to ensure that the justice system *588 maintains the respect of the public that is essential to its mission as the third branch of government.
Construing article V, section 12(a) to insulate a sitting judge from removal or discipline for misconduct during previous judicial service would frustrate and deny the will of the people as expressed in article V, section 12. Misconduct committed by an attorney who subsequently becomes a judge falls within the subject-matter jurisdiction of this Court and the JQC, no matter how remote. For example, in In re Davey, 645 So.2d 398, 410 (Fla.1994), this Court rejected the argument that article V, section 12 does not contemplate acts occurring outside judicial office, and reprimanded a judge for misconduct as an attorney occurring nearly a decade earlier. Further, had Judge Henson moved directly from the county to the circuit bench with no interruption in judicial service, the JQC would have had jurisdiction under article V, section 12 to seek sanctions for his misconduct as county judge. This continuing jurisdiction is the effect of a 1974 amendment specifying that the JQC has jurisdiction over misconduct occurring "during term of office or otherwise":
The amendment expanded the jurisdiction of the JQC by granting it authority to investigate offenses by judges occurring prior to their present term of office (as far back as November 1, 1966). The revision was in direct response to the case of [State ex rel.] Turner v. Earle, 295 So.2d 609 (Fla.1974), in which the supreme court held that a circuit judge could not be disciplined or removed from office as a circuit judge for misconduct committed in a different office.
William A. Buzzett & Deborah K. Kearney, Commentary (1974 Amendment), 26 Fla. Stat. Ann., Art. V, § 12, Fla. Const. (West Supp.2005).
Thus, JQC proceedings are constitutionally authorized for alleged misconduct by a judge during the time he or she was a lawyer. Proceedings are also clearly authorized based on a complaint filed against a judge currently in office for misconduct during a previous term of service in the same or a different judicial office if there has been no interruption of judicial service. Finally, if the complaint is filed no later than one year after judicial service, proceedings are authorized for misconduct by a judge who has left the bench and has not returned. See, e.g., Frank; Hapner. In accord with the purpose of article V, section 12 to protect the judicial system from loss of public confidence caused by misconduct of judges, we construe article V, section 12(a)(1) to confer jurisdiction on the JQC and this Court on a judge presently in office for misconduct during previous judicial service.
In this case, the JQC instituted formal charges against Judge Henson in January 2004, during his current term of office. Thus, both the JQC and this Court have subject-matter jurisdiction over Judge Henson's alleged misconduct of practicing law while still a member of the judiciary as detailed in Count I.
Judge Henson challenged only the Court's jurisdiction on the charge of practicing law while still serving as a county judge, and stipulated to the facts supporting the charge. Having resolved the jurisdictional issue against him, we approve the determination of the Hearing Panel that these facts constitute a violation of Canons 1, 2, 3, and 5 of the Code of Judicial Conduct.

B. Sufficiency of Evidence on Charge of Misconduct As An Attorney
Judge Henson urges this Court to reject the Hearing Panel's finding of guilt on *589 Count II on grounds that it is not supported by clear and convincing evidence. We conclude to the contrary and approve the Hearing Panel's guilt determination.
Findings of fact by a JQC Hearing Panel must be supported by clear and convincing evidence. See In re Graziano, 696 So.2d 744, 753 (Fla.1997). "This Court must then review the findings and determine whether they meet this quantum of proof, a standard which requires more proof than a `preponderance of the evidence' but less than `beyond and to the exclusion of a reasonable doubt.'" Id. (citing Davey, 645 So.2d at 404). Findings that meet this standard are given great weight by this Court. See LaMotte, 341 So.2d at 516. The ultimate responsibility for making a determination on the appropriate sanction rests with this Court. See art. V, § 12(c)(1), Fla. Const.; Graziano, 696 So.2d at 753.
Under the constitutional scheme enacted in 1996, the JQC is divided into separate Investigative and Hearing Panels, with no member serving on both panels in the same proceeding. See art. V, § 12(f)(2)(d), Fla. Const.[3] In attorney discipline proceedings, this Court reviews a referee's findings of fact for competent, substantial evidence. See Fla. Bar v. Barrett, 897 So.2d 1269, 1275 (Fla.2005); Fla. Bar v. Vining, 761 So.2d 1044, 1048 (Fla. 2000). "Absent a showing that the referee's findings are clearly erroneous or lacking in evidentiary support, this Court is precluded from reweighing the evidence and substituting its judgment for that of the referee." Fla. Bar v. Wohl, 842 So.2d 811, 814 (Fla.2003) (quoting Fla. Bar v. Sweeney, 730 So.2d 1269, 1271 (Fla.1998)).
In JQC proceedings both before and after the 1996 revision, we have relied upon the clear and convincing evidence standard without distinguishing findings of fact from whether the facts as found warrant particular discipline. See In re Kinsey, 842 So.2d 77, 85 (Fla.2003) ("Accordingly, we review the findings to ensure that there is clear and convincing evidence to support the alleged ethical violations  a standard of proof which has been described as more than a preponderance of the evidence, but the proof need not be beyond and to the exclusion of a reasonable doubt.") (quoting Davey, 645 So.2d at 404) (quotation marks omitted). We need not decide in this case whether our review of the JQC Hearing Panel's factual findings is subject only to the competent, substantial evidence standard or whether we have an obligation to review the record to determine whether there is clear and convincing evidence because the evidence in this case satisfies both standards.
Even before the creation of the two-stage process in JQC proceedings, we stated that the JQC's findings are given great weight by this Court "because the JQC is in a position to evaluate the testimony and evidence first-hand." Graziano, 696 So.2d at 753.[4] In Davey this Court commented *590 upon the JQC's superior vantage point to resolve credibility questions in declining to discipline a judge for lack of candor in his testimony without a formal allegation and particularized findings by the JQC:
In short, we are deprived of the benefit of the Commission's eyes and ears. As a reviewing body, we possess limited insight into such subjective matters as a witness's sincerity, demeanor, or tone, or the comparative credibility of competing witnesses. Without the Commission's insight, we can do little more than take a stab in the dark on such matters.
645 So.2d at 406. We accord the same deference to findings of fact in attorney discipline cases, in which findings that can result in disbarment are made by a single referee rather than the six-member Hearing Panel used in JQC proceedings. See Fla. Bar v. Batista, 846 So.2d 479, 483 (Fla.2003) ("Because the referee is in the best position to judge the credibility of the witnesses, we defer to the referee's assessment and his resolution of the conflicting testimony."); Fla. Bar v. Hayden, 583 So.2d 1016, 1017 (Fla.1991) (where testimony conflicts, referee is charged with responsibility of assessing credibility based on demeanor and other factors).
Judge Henson asserts that the evidence did not reach the threshold of clear and convincing evidence necessary to justify removal from office. He relies on this Court's statement in Davey that proof by clear and convincing evidence
entails both a qualitative and quantitative standard. The evidence must be credible; the memories of the witnesses must be clear and without confusion; and the sum total of the evidence must be of sufficient weight to convince the trier of fact without hesitancy.
[C]lear and convincing evidence requires that the evidence must be found to be credible; the facts to which the witnesses testify must be distinctly remembered; the testimony must be precise and explicit and the witnesses must be lacking in confusion as to the facts in issue. The evidence must be of such weight that it produces in the mind of the trier of fact a firm belief or conviction, without hesitancy, as to the truth of the allegations sought to be established.

Slomowitz v. Walker, 429 So.2d 797, 800 (Fla. 4th DCA 1983).
645 So.2d at 404.
In Davey, this Court rejected the JQC's recommendation that a judge be removed from office, and reprimanded him instead for misconduct occurring when he was in private practice. This Court chose the lesser penalty because the evidence met the clear and convincing evidence standard on only one of two alleged violations found by the JQC. The Court rejected the JQC's finding that after his election as a judge but before he assumed office, the judge attempted to keep a fee payment for himself rather than share it with his law firm, but was frustrated in the attempt because the check was made out to the firm. The evidence was insufficient because one witness gave contradictory testimony as to whether the fee payment check had been made out to the judge personally or to his law firm, while the only other witness to testify on the matter could not say conclusively that he ever saw the check. See id. at 404-05.
Judge Henson asserts that, as in Davey, the evidence that he advised Ms. Jimenez to leave the United States rather than face trial was "indecisive, confused, and contradictory." Id. at 405. Addressing the testimony *591 of each of the three primary witnesses against him, Judge Henson argues first that Ms. Jimenez never directly testified that Judge Henson advised her to leave the United States, and that her "belief" that Judge Henson had so advised her is insufficient to prove the charge. He next points to an apparent inconsistency in the testimony of Dr. Jimenez, Ms. Jimenez's father, on whether it was Judge Henson or Dr. Jimenez who stated that Colombia and the United States had an extradition treaty, a significant consideration in determining whether it would be a safe haven for Ms. Jimenez. Judge Henson then asserts that Nesmith, an attorney who shared office space with him, was not credible in testifying that Judge Henson told him he had advised Ms. Jimenez and her father that she should leave the country. Judge Henson challenges Nesmith's credibility on grounds that Nesmith could not recall precisely when this remark was made, and that in a previous statement Nesmith did not disclose that Judge Henson had said he would deny making the remark if asked and that Judge Henson offered to refer a case to Nesmith to buy his silence on the Jimenez disclosure. Judge Henson also argues that each of these witnesses was biased against him  Ms. Jimenez because she blamed Judge Henson for her sixteen-year prison sentence, Dr. Jimenez for the same reason and because of a fee dispute with Judge Henson (which led Dr. Jimenez to file a Bar grievance against Judge Henson), and Nesmith because he and Judge Henson had personal and professional disagreements. Finally, he asserts that Ms. Jimenez is not credible because of her criminal conviction and that Nesmith's credibility is suspect because he has twice been sanctioned by this Court  a reprimand and a suspension  for ethical violations.
Contrary to Judge Henson's assertions, none of the matters he raises regarding the testimony of the witnesses against him deprives the evidence of the probative force necessary to prove the allegation in Count II. The other key witnesses corroborated Ms. Jimenez's testimony that at several points during the course of his representation of her, Judge Henson conveyed the suggestion that she should leave the United States rather than face trial on her DUI manslaughter charges. He asked whether she retained her passport and whether she had family remaining in Colombia, and discussed with her on several occasions the option of fleeing to Colombia. Dr. Jimenez testified that Judge Henson directly made the same suggestion to him in a separate conversation, and Nesmith testified that Judge Henson acknowledged advising Ms. Jimenez and her father that she should leave the country.
In this case, Diana Jimenez and Dr. Jimenez testified by videotaped deposition, and Maria Jimenez via a transcribed deposition. Accordingly, their testimony is available to this Court in the same form as it was presented to the Hearing Panel. We have stated that the normal level of deference accorded by an appellate court to a lower tribunal's findings of fact does not fully apply when the findings are based on evidence other than live testimony. See Parker v. State, 873 So.2d 270, 279 (Fla. 2004). However, both Judge Henson and Nesmith appeared personally before the Hearing Panel and were questioned vigorously by panel members as well as by opposing counsel. Therefore, we decline to substitute our credibility determination for that of the Hearing Panel, and we conclude based on this record that there is no legal reason for us to overturn the Hearing Panel's findings resolving conflicts in the evidence against Judge Henson.
Resolving conflicts in the evidence in favor of the Hearing Panel's findings, we *592 conclude that the accusation that Judge Henson advised Ms. Jimenez to flee the jurisdiction to avoid trial is supported by clear and convincing evidence. This Court has noted that "even when the evidence is in conflict, the proof may be more than sufficient to meet the standard of clear and convincing evidence." In re Bryan, 550 So.2d 447, 448 n. * (Fla.1989); see also In re Guardianship of Schiavo, 780 So.2d 176, 179 (Fla. 2d DCA 2001) ("The clear and convincing standard of proof, while very high, permits a decision in the face of inconsistent or conflicting evidence."). The evidence here was not, as in Davey, "indecisive, confused, and contradictory" on the essential question of whether Judge Henson advised Ms. Jimenez to flee the United States. In Davey, one witness could not testify whether in fact he saw a fee check that constituted a crucial piece of evidence, and another witness gave contradictory testimony on the question.
In this case, the testimony of Ms. Jimenez that Judge Henson advised her to return to Colombia rather than face trial was corroborated by testimony from Dr. Jimenez that Judge Henson advised him to have Ms. Jimenez flee and from Nesmith that Judge Henson stated to him that he told Ms. Jimenez and Dr. Jimenez that Ms. Jimenez should flee the country. Importantly, Judge Henson does not deny that a discussion about fleeing to Colombia took place with Dr. Jimenez and attorney Nesmith. However, in his version it was Dr. Jimenez who initiated the improper notion and not himself. This version flatly contradicts the testimony of both Nesmith and Dr. Jimenez, but is significant in that it corroborates their testimony that conversations on Ms. Jimenez fleeing did take place.
The cumulative, corroborative weight of the testimony is more than sufficient for the Hearing Panel to have rejected Judge Henson's testimony and concluded by clear and convincing evidence that he counseled Ms. Jimenez to commit an illegal act. Certainly, each of these witnesses had reasons to be biased against Judge Henson. Further, to some degree, Ms. Jimenez's crimes and attorney Nesmith's previous ethical violations were relevant to their credibility. However, these are matters of impeachment to be taken into consideration by the Hearing Panel, and are not sufficient justification for this Court to overturn the Hearing Panel's determination on the critical issue of witness credibility. Similarly, it was for the Hearing Panel, and not this Court, to determine the significance of omissions in previous statements and to resolve any conflicts in the evidence over who said what concerning Colombia's extradition treaty with the United States.
Accordingly, we accept the finding of the Hearing Panel that Judge Henson advised Ms. Jimenez to flee the United States in anticipation of her impending DUI manslaughter trial. We conclude that Judge Henson violated Rules of Professional Conduct 4-1.2(d) and 4-8.4(a)-(c) of the Rules Regulating the Florida Bar.[5]

C. Removal from Office
Regarding the appropriate sanction, Judge Henson argues that in recommending removal the panel failed to consider the three character witnesses and six character letters in his favor. Although there is no discussion in the Hearing Panel's findings as to the character evidence, the Hearing Panel specified that it gave "full consideration [to] all the evidence"  as do we. However, the character evidence, which includes testimonials of *593 Judge Henson's trustworthiness, competence, and strong work ethic both as an attorney and judge, cannot overcome the grievous nature of the violations. We have previously removed judges despite strong character evidence or an unblemished judicial record when their misconduct was fundamentally inconsistent with the responsibilities of judicial office or struck at the heart of judicial integrity. See, e.g., Graziano, 696 So.2d at 749; In re Johnson, 692 So.2d 168, 173 (Fla.1997); LaMotte, 341 So.2d at 517-19.
Next, Judge Henson argues that removal from office is too severe a sanction for the single instance of misconduct he has acknowledged in Count I. His argument is premised on this Court rejecting the finding of guilt on Count II, the more grievous of the two violations. We have determined that the finding of guilt as to Count II is supported by clear and convincing evidence. Judge Henson does not assert that removal is an inappropriate sanction if we approve the Hearing Panel's findings of guilt on both Counts I and II.
Judge Henson admitted that he violated the Code of Judicial Conduct in accepting a $15,000 retainer to represent Ms. Jimenez and in counseling her during his final two weeks as a county court judge. This was a clear violation not only of Canon 5G of the Code of Judicial Conduct but also article V, section 13 of the Florida Constitution.[6] We reject Judge Henson's attempt to minimize the gravity of this misconduct. We recognize that he had concluded his judicial duties and moved out of his courthouse office. We also note that he did not enter a notice of appearance or appear in court on behalf of his client. Nonetheless, as the Hearing Panel recognized, he knowingly committed the transgression of beginning to practice law too soon. This was not a mere technical violation of the judicial canon and constitutional provision prohibiting judges from practicing law. Judge Henson knew exactly what he was doing. Claiming that he was on vacation, he did not resign from his position. Instead, while still a judge he accepted a referral of a case from a bail bondsman, received and held a $15,000 retainer check, arranged for representation of his client at a bond hearing, and met with her in his capacity as her attorney.
Further, we need not consider the misconduct in Count I alone. Removal from office is necessitated by the combined misconduct in Counts I and II. It is proper to consider the violations in tandem, particularly because they involve the same client. Cf. In re McMillan, 797 So.2d 560, 573 (Fla.2001) ("Even if a single impropriety were considered insufficient in isolation, the cumulative weight of the improprieties supports removal."); In re Crowell, 379 So.2d 107, 110 (Fla.1979) (reviewing acts of misconduct "as a whole" in approving removal of judge); In re Graham, 620 So.2d 1273, 1276 (Fla.1993) (reviewing "cumulative conduct" of judge and the "totality of circumstances" in approving removal of judge).
As noted by counsel for the JQC, this Court has removed judges from office for less egregious misconduct. See Ford-Kaus, 730 So.2d at 272 (removing a judge who while a lawyer badly mishandled the filing of an appellate brief written by another attorney and then lied to her client about the filing and authorship of the brief and billed her client for work she did not actually perform, and who as a judge failed to disclose that an attorney appearing in her court was also personally representing *594 the judge in a different matter); Graziano, 696 So.2d at 747-48 (removing a judge who improperly influenced the decision to hire her friend as a guardian ad litem, awarded her friend a pay raise despite her friend's unsatisfactory job performance, and spoke insultingly to court employees); Johnson, 692 So.2d at 172-73 (removing a judge for backdating plea agreements and conviction dates and for ordering an inordinate number of continuances in order to minimize the number of cases reported as being on her docket); In re Garrett, 613 So.2d 463, 465 (Fla.1993) (removing a judge who shoplifted an item from an electronics store); LaMotte, 341 So.2d at 513 (removing a judge who used a government credit card to pay for personal travel expenses).
Ultimately, Judge Henson's misconduct deprives him of the probity and moral authority necessary to perform the duties of a circuit judge. As we stated in Ford-Kaus, "[t]he judicial system can only function if the public is able to place its trust in judicial officers." 730 So.2d at 277. An attorney who has practiced law while still a judge and then counseled a client facing trial to avoid prosecution by fleeing the jurisdiction does not deserve, and likely will not receive, the public's trust. Having compromised his own integrity, Judge Henson would place the integrity of our judicial system at stake were he allowed to continue in office. This we cannot allow.

III. CONCLUSION
For the reasons set forth herein, we find by clear and convincing evidence that Judge James E. Henson violated Canons 1, 2, 3, and 5 of the Code of Judicial Conduct in practicing law while he was a county judge, and that he violated Rules 4-1.2(d) and 4-8.4(a), (b) and (c) of the Rules of Professional Conduct in advising a client in a criminal case to flee the United States. For these violations, we determine that Judge Henson is presently unfit to hold office, and we therefore remove him from his position as Circuit Judge of the Ninth Judicial Circuit with termination of compensation.
It is so ordered.
PARIENTE, C.J., and WELLS, ANSTEAD, LEWIS, QUINCE, CANTERO, and BELL, JJ., concur.
NOTES
[1] Canon 1 requires judges to personally observe high standards of conduct. Canon 2A requires judges to respect and comply with the law and act in a manner that promotes public confidence in the integrity of the judiciary. Canon 3A provides that "[t]he judicial duties of a judge take precedence over all the judge's other activities." Canon 5G prohibits judges from practicing law. This proscription also appears in article V, section 13, Florida Constitution.
[2] Rule 4-1.1 requires a lawyer to provide competent representation. Rule 4-1.2(d) provides that a lawyer "shall not counsel a client to engage . . . in conduct that the lawyer knows or reasonably should know is criminal or fraudulent." Rule 4-1.3 provides that a lawyer "shall act with reasonable diligence and promptness in representing a client." Rule 4-1.4 provides that a lawyer shall keep a client reasonably informed about the status of a matter, and explain a matter sufficiently to permit the client to make informed decisions. Rules 4-8.4(a)-(c) prohibit a lawyer from violating the Rules of Professional Conduct or inducing another to do so, committing a criminal act that "reflects adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer in other respects," or engaging in "conduct involving dishonesty, fraud, deceit, or misrepresentation."
[3] The 1996 revision to article V, section 12 established a two-stage process governing the JQC's role in judicial discipline proceedings. See art. V, § (12)(b), Fla. Const. This process, which provides for a charging decision by the Investigative Panel and an adjudicatory hearing before the Hearing Panel, created a neutral adjudicative body within the JQC. See William A. Buzzett & Deborah K. Kearney, Commentary (1996 Amendment), 26 Fla. Stat. Ann., Art. V, § 12, Fla. Const. (West Supp. 2005) (noting that revision was proposed in response to criticism that "once the JQC had been exposed to all the investigative information and it determined probable cause to file formal charges, it would be difficult for the same commission to act as a neutral adjudicative body").
[4] In Graziano, which we decided in 1997, we specified that the 1995 version of the Florida Constitution applied. See 696 So.2d at 746 n. 1.
[5] We decline to adopt the Hearing Panel's finding that this conduct violated Rules 4-1.1, 4-1.3, and 4-1.4, which we consider a scrivener's error.
[6] "All justices and judges shall devote full time to their judicial duties. They shall not engage in the practice of law or hold office in any political party." Art. V, § 13, Fla. Const.