PER CURIAM.
We have for review the recommendation of the Florida Judicial Qualifications Commission (JQC) that N. James Turner, Circuit Judge for Florida’s Ninth Judicial Circuit, be removed from office for a series of violations of the Code of Judicial Conduct. We have jurisdiction. See art. V, § 12, Fla. Const. For the reasons we explain, we approve the JQC’s recommendation of removal.
On July 8, 2009, the Investigative Panel of the JQC filed a notice of formal charges against Judge Turner, pursuant to article V, section 12(b) of the Florida Constitution. After several amendments, the matter proceeded to the JQC Hearing Panel (the Panel) on an amended notice charging thirteen counts of judicial misconduct. Some of these counts stemmed from Judge Turner’s actions during his ultimately successful 2008 campaign for circuit judge, and some stemmed from his conduct after he assumed office.
After considering all of the evidence presented and conducting a final hearing, the Panel found Judge Turner guilty of six specific charges as well as a separate charge asserting that certain of the specific charges constituted a pattern of misconduct. Based on Judge Turner’s commis *901 sion of “multiple canon violations,” the Panel recommended his removal from office. As explained in detail below, we accept the Panel’s findings of guilt with respect to five of the specific charges, as well as the charge of a pattern of misconduct. We remove Judge Turner from office based on these violations. We need not reach the other specific charge — a charge regarding the solicitation of campaign contributions, which Judge Turner challenges on constitutional grounds.
In judicial disciplinary proceedings, this Court must independently review the JQC’s findings to determine whether they are established by clear and convincing evidence. In re Graziano, 696 So.2d 744, 753 (Fla.1997) (noting that the standard for clear and convincing evidence falls between “a preponderance of the evidence” and “beyond ... reasonable doubt”). “If the findings meet this intermediate standard, then they are of persuasive force and are given great weight.” Id. at 753. “This is so because the JQC is in a position to evaluate the testimony and evidence first hand.” Id.
We now examine the specific charges on which the Panel found Judge Turner guilty.
COUNT 5
Count 5 alleges a campaign contribution solicitation in violation of Canon 7C(1), which proscribes the personal solicitation of campaign funds by judicial candidates. Judge Turner challenges the constitutionality of Canon 7C(1), contending that the canon violates the First Amendment of the United States Constitution. In finding Judge Turner guilty on count 5, the Panel discussed Judge Turner’s constitutional argument but ultimately declined to make a finding or conclusion regarding the matter, recognizing that any such determination should come from this Court. Because we conclude that Judge Turner’s misconduct apart from the charges contained in count 5 requires his removal, we too decline to decide the constitutional issue at this juncture. See, e.g., In re Holder, 945 So.2d 1130, 1133 (Fla.2006) (noting that “we have long subscribed to a principle of judicial restraint by which we avoid considering a constitutional question when the case can be decided on nonconstitutional grounds”).
COUNT 7
The allegations in count 7 focus on Judge Turner’s inappropriate campaign finance conduct, which occurred before he took the bench:
7. During the campaign for the office you now hold, you knowingly accepted and received a very substantial campaign contribution made for the purpose of influencing the results of the election, whether characterized as a gift or loan, far in excess of the $500 limit established by Ch. 106, Florida Statutes, from your mother (Mignon Gordon) which you used to pay for your campaign, in violation of Chapter 106, Florida Statutes, and Canons 1, 2A and 7C(1) of the Code of Judicial Conduct.
The Panel determined that Judge Turner was guilty of violating chapter 106 and Canon 7C(1), but determined that Canons 1 and 2A were not applicable to Judge Turner’s misconduct.
The gravity of the misconduct charged in count 7 lies in Judge Turner’s violation of Florida’s campaign finance laws, set forth in chapter 106, Florida Statutes. In light of our decision not to address the constitutionality of Canon 7C(1) — explained above — we do not address the Panel’s finding that Judge Turner’s conduct described in count 7 violates that canon. Contrary to the Panel’s determination that Canons 1 and 2A were not applicable, we conclude that Judge Turner’s violations of *902 chapter 106 also constituted violations of the requirement of Canon 1 that judges maintain “high standards of conduct” and the requirement of Canon 2A that judges “respect and comply with the law and ... act at all times in a manner that promotes public confidence in the integrity ... of the judiciary.”
Florida law provides that
[e]xcept for political parties, no person, political committee, or committee of continuous existence may, in any election, make contributions in excess of $500 to any candidate for election to or retention in office or to any political committee supporting or opposing one or more candidates.
§ 106.08(l)(a), Fla. Stat. (2008). A “loan” is included in the definition of “contribution.” § 106.011(3)(a), Fla. Stat. (2008). Moreover, any contribution received by the candidate for election “on the day of that election or less than 5 days prior to the day of that election must be returned by him or her to the person or committee contributing it and may not be used or expended by or on behalf of the candidate.” § 106.08(3)(a), Fla. Stat. (2008).
The Panel found that near the end of his 2008 campaign, Judge Turner solicited funds from his mother, Mignon Gordon, to help pay off outstanding campaign debt. At Judge Turner’s request, Ms. Gordon refinanced her condominium and on November 5, 2008 — one day after Judge Turner was elected to office — wired $42,288.75 into Judge Turner’s personal account. On that same day, Judge Turner transferred $15,000 from his personal account to his campaign account and two days later transferred another $15,000. During the JQC investigation, Judge Turner admitted that the money he loaned to his campaign came from the funds that his mother loaned him.
The Panel concluded that the $30,000 that Judge Turner’s campaign received from his mother was in excess of the $500 limit on individual campaign contributions established in section 106.08(l)(a), Florida Statutes, and that the loan was received after the cut-off date established in section 106.08(3)(a), Florida Statutes. Judge Turner does not dispute the fact that he received a loan from his mother in violation of the contribution limitations established by Florida law. We accept these findings and the Panel’s determination of guilt.
COUNTS 8 AND 9
The charges contained in counts 8 and 9 stem from actions taken by Judge Turner — after he became a sitting judge— regarding a foreclosure action against his mother. The counts allege:
8. As a sitting circuit court judge, on or about November 20, 2009, you knowingly filed a notice of appearance in pending litigation in Dade County, Florida (CitiMortgage, Inc. v. Gordon, Case No. 2009-74992-CA-01) where you purported to appear to represent your mother in foreclosure proceedings brought against her therein, in violation of Canons 1, 2A and 5G of the Code of Judicial Conduct.
9. As a sitting circuit court judge, you knowingly represented and acted as litigation counsel for your mother in the foreclosure proceeding in Dade County, Florida, described above by, inter alia, communicating with counsel for the mortgagee on her behalf, in Osceola County, Florida, in violation of Canons 1, 2A and 5G of the Code of Judicial Conduct.
Regarding both counts, the Panel determined that Judge Turner was guilty of violating Canons 1, 2A, and 5G.
Canon 1 of Florida’s Code of Judicial Conduct states:
*903 An independent and honorable judiciary is indispensable to justice in our society. A judge should participate in establishing, maintaining, and enforcing high standards, of conduct, and shall personally observe those standards so that the integrity and independence of the judiciary may be preserved. The provisions of this Code should be construed and applied to further that objective.
Canon 2A provides that
[a] judge shall respect and comply with the law and shall act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary.
In furtherance of maintaining the integrity, independence, and impartiality of Florida’s judiciary, Canon 5G prohibits judges from practicing law except in certain narrow circumstances:
Practice of Law. A judge shall not practice law. Notwithstanding this prohibition, a judge may act pro se and may, without compensation, give legal advice to and draft or review documents for a member of the judge’s family.
The commentary to Canon 5G states that [t]he Code allows a judge to give legal advice to and draft legal documents for members of the judge’s family, so long as the judge receives no compensation. A judge, must not, however, act as an advocate or negotiator for a member of the judge’s family in a legal matter.
(Emphasis added.)
The Panel found that Judge Turner violated Canons 1, 2A, and 5G after his mother had become unable to repay the loan she incurred when refinancing her condominium and was facing foreclosure. In September 2009, Judge Turner began negotiating with his mother’s mortgage company and wrote a letter on September 22, 2009, to her mortgage broker:
Dear Mr. Steiner:
I am a lawyer from Orlando and my mother is facing foreclosure on a Citi-Mortgage mortgage. My mother is trying to do a reverse mortgage and has been approved for a Federally-Insured Reverse Mortgage. However, the appraisal came in low and we are seeking to have a short payoff of $150,000.00. I have tried calling your office to discuss this matter with you personally but was not able to get through.
If you and your client are in agreement, we can close this before November 30, 2009.
For your information, my mother had a flawless payment record but was completely wiped out by Bernard Madoff. Thank you very much.
N. James Turner
When attorneys for the mortgage company requested a signed authorization from Ms. Gordon to discuss her situation with Judge Turner, Judge Turner requested and secured such authorization. On November 20, 2009, Judge Turner filed a notice of appearance in his mother’s case, and on December 1, 2009, Judge Turner wrote to opposing counsel:
I am an attorney licensed to practice in Florida but I do not practice. My mother is Mignon Gordon and I filed a Notice of Appearance in the above matter on her behalf solely to avoid a default. I understood we were negotiating with your client toward a short payoff so that my mother could obtain a reverse mortgage.
When notified on December 7, 2009, that a short sale would not be permitted, Judge Turner instructed lender’s counsel to “proceed with the foreclosure action. We will defend accordingly.”
The Panel was not persuaded by Judge Turner’s explanation that he was in a panic *904 and mistakenly believed that the canons permitted his actions. The Panel determined that Judge Turner had intentionally and carefully crafted the language of his correspondence to hide the fact that he was a sitting judge in order to circumvent the prohibition on judges practicing law. The Panel was not convinced by Judge Turner’s argument that he failed to disclose his position so as not to appear to be wielding undue influence.
The record contains clear and convincing evidence that Judge Turner knowingly engaged in the practice of law, in violation of judicial canons, by negotiating "with counsel for his mother’s mortgagee and by filing a notice of appearance on her behalf. Accordingly, we accept the Panel’s findings and determination of guilt.
COUNT 10
The Panel next found Judge Turner guilty — in part — of violating count 10, which set forth the following accusation:
10. While performing the duties of the office you now hold, you made inappropriate comments and had improper, unwanted and uninvited physical contact with subordinate female personnel, including hugging, kissing and massaging them, attempting to force yourself into the personal and private lives of subordinate female employees, including loaning them money, inviting yourself to their homes and family activities and/or appearing without invitation at their homes and family activities and injecting yourself into their families’ lives without being invited or asked to do so, insisting on communicating with and seeing certain subordinate female court employees for reasons unrelated to the performance of your or their official duties, and intemperately and vexatious [sic] screaming and yelling at, berating, belittling and humiliating certain subordinate female employees, including your judicial assistants and court clerks in open court and otherwise, thus creating a hostile work environment in violation of Fla. Stat. § 760.10 and Canons 1 and 2A of the Code of Judicial Conduct.
The Panel determined that Judge Turner was guilty of injecting himself into the personal life of one subordinate female employee — Heather Shelby — in violation of Canons 1 and 2A, but not guilty of the remainder of the charge.
The Panel found that Ms. Shelby, an employee of the Osceola County Clerk of Court, had begun working with Judge Turner in February 2009, when Judge Turner began handling the domestic violence docket. In April or May of 2009, Judge Turner summoned Ms. Shelby to his chambers on the sixth floor of the courthouse, where he was in a T-shirt and gym shorts. Judge Turner closed the door to his office and began to have a personal discussion with Ms. Shelby for nearly half an hour. When Ms. Shelby informed Judge Turner that she needed to return to her desk on the second floor of the courthouse, he thanked her for coming and kissed her on the cheek. The Panel found that although Ms. Shelby felt that this meeting crossed professional boundaries, she decided not to report it after conferring with a coworker, who agreed that it might be an isolated occurrence.
The Panel found, however, that Judge Turner’s actions toward Ms. Shelby only became increasingly inappropriate. Judge Turner soon began calling Ms. Shelby at her desk and, one morning in October 2009, was sitting at Ms. Shelby’s desk when she arrived at work. Judge Turner asked Ms. Shelby to lunch, to which she initially agreed despite feeling uncomfortable. When Ms. Shelby tried to cancel the lunch, she was not able to do so because Judge Turner had cleared his afternoon *905 docket in order to be available at Ms. Shelby’s convenience. When Ms. Shelby inquired into the purpose of the lunch, Judge Turner told her it was for various personal reasons. The Panel found that Ms. Shelby would not have gone to lunch with Judge Turner had he not been a judge.
The situation further progressed to the point where Judge Turner would call Ms. Shelby constantly — including from the bench — and would show up at her desk several times a day, starting in the morning. If he did not see her at the beginning of a work day, Judge Turner would send Ms. Shelby emails. Judge Turner would invent reasons to see Ms. Shelby, to the point that Ms. Shelby described it as “an everyday thing; ... he was down at my desk continuously all day long ... I would turn around and he would be there.” Another clerk’s office employee, who sat next to Judge Turner during domestic violence hearings and who knew Ms. Shelby, observed that Judge Turner’s efforts to locate Ms. Shelby in the courthouse “got worse” over time.
The Panel found that a central theme of Judge Turner’s fixation on Ms. Shelby’s personal life was Ms. Shelby’s then twelve-year-old son, a cancer patient. Judge Turner — himself a cancer survivor — would inquire about treatment and medical bills and repeatedly sought to visit Ms. Shelby’s son in the hospital during his treatment. Ms. Shelby considered her son’s treatment a private family matter and consistently rebuffed Judge Turner’s efforts, but to no effect. Judge Turner continued to ask if he could visit Ms. Shelby’s son at their home or drive him to treatment. When Judge Turner found out that Ms. Shelby and her son would be attending a local performance of a Broadway musical, he suggested that he come to the theater at intermission to take photos. Ms. Shelby politely declined, but Judge Turner persisted, even finding out the scheduled intermission time in order to coordinate his arrival. Despite Ms. Shelby’s rebuffs, Judge Turner showed up at the theater at intermission, met Ms. Shelby and her son, and took photos of them. He later told Ms. Shelby that he could not wait to spend more time with her son, which she again refused.
The Panel further found that in February 2010, Ms. Shelby was forced to physically hide in order to avoid Judge Turner. Judge Turner, undeterred, began to search for the hiding Ms. Shelby, asking loudly, “Where’s Heather?” The Chief Judge of the circuit had to call Judge Turner on his cell phone and order him to stop searching for Ms. Shelby, and the clerk’s office had to change Ms. Shelby’s phone number and move her desk to another area.
The Panel found that Judge Turner’s interest in Ms. Shelby was not romantic or sexual, but instead stemmed from Judge Turner’s loneliness and need to be needed. Dr. Barbara Mara, a psychologist to whom Judge Turner submitted himself for a psychological evaluation at the recommendation of the Chief Judge, reported that Judge Turner suffered from “no major mental illness or gross pathology.” Instead, Dr. Mara determined that Judge Turner’s inappropriate behavior was a result of a “somewhat self-centered opinion of himself and others” and a “lack of psychological insight and minimization trends.” Dr. Mara concluded:
In my clinical opinion, Judge Turner’s evaluation results suggest an individual who prefers to be in control, with a need to please others, and might push boundaries and rules to meet some of his needs. His lack of psychological insight, or simply put, sometimes he does not get it, might lead to poor judgment behavior whose intent is to receive atten *906 tion, social approval and to fulfill the need to help others. His social behavior might be seen as audacious and uninhibited. All of these clinical characteristics relate to personality traits and not any major mental health concerns.
The Panel concluded its findings regarding Judge Turner’s conduct toward Ms. Shelby by noting that although Judge Turner was an expert employment attorney before he joined the bench, he was oblivious to the fact that his superior position would exploit Ms. Shelby’s need for a job and reluctance to anger or upset him. The Panel found that although there was no sexual component to Judge Turner’s actions, they were nonetheless unwarranted and unwelcome and thus constituted an inappropriate intrusion into Ms. Shelby’s personal and family life.
The record contains clear and convincing evidence to support the Panel’s findings. Judge Turner does not dispute the substance of Ms. Shelby’s allegations but only challenges the frequency with which he intruded into Ms. Shelby’s life and the attitude with which Ms. Shelby met his advances. The differences between Judge Turner’s account of events and Ms. Shelby’s account are explained by Dr. Mara’s testimony that Judge Turner lacked insight into the true dynamics of his relationship with Ms. Shelby. Moreover, Ms. Shelby’s testimony was corroborated — at least in part — by the testimony of another court employee. The Panel’s decision to find Ms. Shelby’s testimony more credible than Judge Turner’s is therefore supported by an abundance of evidence. We accept the Panel’s findings and determination of guilt.
COUNT 12
The final specific charge of which the Panel found Judge Turner guilty alleged:
12. While acting as a sitting circuit court judge in open court in State v. John Doe, a Child, Osceola County Case No. 2009 CJ 000327, on or about March 12, 2010, you unlawfully ordered the seizure of jewelry from a child, arbitrarily determined its value and proposed to offset the court costs owed by the child against your summary determination of the value of the jewelry, in violation of Canons 1, 2A and 3[B](3)[1] of the Code of Judicial Conduct.
The Panel determined that Judge Turner was guilty of an error in judgment and a technical violation of the canons but recommended that no punishment be imposed based on the violation.
Canon 3B(3) provides that “[a] judge shall require order and decorum in proceedings before the judge.” The Panel found that Judge Turner violated this canon — as well as Canons 1 and 2A — when, while questioning a juvenile appearing before him about the juvenile’s nonpayment of costs, Judge Turner noticed that the juvenile was wearing a “nice diamond earring.” When asked about the worth of the jewelry, the juvenile informed Judge Turner that it was fake and had cost seven dollars. Judge Turner offered to give the juvenile a credit of ten dollars toward his court costs in exchange for the earring. When the juvenile agreed, Judge Turner instructed the deputy to take the earring from the juvenile and place it in an evidence bag and stated that he would credit ten dollars toward the juvenile’s outstanding court costs.
The Panel found, however, that Judge Turner did not know his conduct was prohibited and that — when the Chief Judge called shortly thereafter and informed *907 Judge Turner that his conduct was inappropriate — Judge Turner immediately directed the clerk to prepare the necessary paperwork and return the earring.
The transcript from the hearing in which the alleged conduct occurred contains clear and convincing evidence to support the Panel’s findings. Accordingly, we accept the Panel’s findings of fact regarding count 12. We do not, however, accept the Panel’s recommendation that Judge Turner be spared punishment for this conduct. Instead — as explained below — we consider this violation as a part of the pattern of misconduct engaged in by Judge Turner.
COUNT 13
Finally, the Panel found Judge Turner guilty — in part — of count 13, which alleged that the charged violations, “taken collectively, constitute[ ] a pattern of misconduct which raises serious questions regarding [his] fitness to perform the duties of the office [he] now hold[s].” The Panel determined that Judge Turner was guilty of the pattern of misconduct alleged in count 13 to the extent that he was found guilty of counts 5, 7, 8, 9, and, in part, 10. Based on our acceptance of the Panel’s findings of fact described above, we modify the Panel’s findings regarding count 13 to reflect a pattern of misconduct based on the conduct described in counts 7, 8, 9, 10, in part, and 12. We accept the Panel’s conclusion that the pattern of misconduct established by Judge Turner’s many ethical violations raises serious questions regarding Judge Turner’s fitness to perform the duties of his office.
DISCIPLINE
“Although this Court gives the findings and recommendations of the JQC great weight, the ultimate power and responsibility in making a determination to discipline a judge rests with this Court.” In re Colodny, 51 So.3d 430, 431 (Fla.2010) (quoting In re Renke, 933 So.2d 482, 493 (Fla.2006)). Here, Judge Turner engaged in a broad variety of serious misconduct both before and upon being elevated to the bench. Because Judge Turner gained his office partially through illegal means and committed serious violations of the judicial canons upon assuming his role as a judge, we determine that he has engaged in conduct unbecoming a member of Florida’s judiciary and is unfit to perform the duties of his office. Accordingly, we conclude that removing Judge Turner from the bench is the appropriate discipline for the serious violations established here, and we accept the Panel’s recommendation.
Judge Turner committed a serious campaign finance violation by accepting and failing to report the $30,000 campaign loan from his mother. Under Florida’s Campaign Finance Law, contributions to any candidate are limited to $500 per person. § 106.08(l)(a), Fla. Stat. (2008). Moreover, a candidate is not permitted to accept campaign donations on the day of the election or less than five days prior to the election. § 106.08(3)(a), Fla. Stat. (2008). Judge Turner’s conduct is a clear violation of sections 106.08(l)(a) and 106.08(3)(a) and could not plausibly have been an innocent mistake given the plain language of these provisions.
We have dealt with campaign finance violations similar to Judge Turner’s in the past. See In re Pando, 903 So.2d 902 (Fla.2005); In re Rodriguez, 829 So.2d 857 (Fla.2002). In Pando, the Panel found that Judge Pando had accepted a $25,000 personal loan from her mother for the purpose of influencing the election and had misrepresented the source of the loan to avoid the $500 contribution limitation. 903 So.2d at 902. We accepted the JQC’s rec *908 ommendation of a public reprimand and a $25,000 fíne for Judge Pando. Id. at 904.
In Rodriguez, we rejected the Panel’s initial recommendation of a public reprimand and remanded the case for a formal hearing. 829 So.2d at 859. The Panel subsequently determined that Judge Rodriguez had knowingly accepted a $200,000 loan from her boyfriend, filed misleading campaign reports with the Division of Elections misrepresenting the source and date of the loan, and failed to deposit all of the funds within the requisite time. Id. We accepted the Panel’s revised recommendation that Judge Rodriguez be suspended for four months without pay, be fined $40,000, pay all court reporter’s fees, and receive a public reprimand.
Judge Turner argues that his conduct is more akin to that present in Colodny, in which we imposed a public reprimand and a $5000 fíne on a judge who accepted a loan of $125,000 from her father, paid in four equal installments, and — upon receiving each installment — deposited the same amount into her campaign account. 51 So.3d at 431.
In addition to his campaign finance violations, Judge Turner is guilty of defying Florida’s prohibition against judges practicing law. Canon 5G expressly limits the legal assistance a judge may provide to a family member to “giv[ing] legal advice” and “drafting] or reviewing] documents” without compensation. Judges clearly are prohibited from practicing law for family members beyond those limits and thus are clearly forbidden to negotiate or advocate on behalf of a family member in a legal matter. Yet Judge Turner undertook to represent his mother in her foreclosure proceeding while he was a sitting judge on Florida’s Ninth Judicial Circuit. Judge Turner communicated and negotiated with counsel for his mother’s mortgagor and filed a notice of appearance on her behalf. Judge Turner’s claim that he misunderstood the canon rings hollow. There is no other reasonable interpretation of the canon than that a judge is flatly prohibited from negotiating and advocating on behalf of a family member in a legal matter.
We have previously removed a judge from office for the unauthorized practice of law while a judge. In re Henson, 913 So.2d 579 (Fla.2005). In Henson, we accepted the Panel’s findings that Judge Henson had received a $15,000 retainer, had begun to counsel a client in his final two weeks as a county court judge, and had advised his client to flee the country in order to avoid trial. Id. at 592-93. Although our decision to remove Judge Henson was based on multiple violations, we “reject[ed] Judge Henson’s attempt to minimize the gravity of’ the fact that he practiced law while a sitting judge. Id. at 593. We emphasized the magnitude of Judge Henson’s violation despite the fact that he “had concluded his judicial duties and moved out of his courthouse office.” Id. Judge Turner, on the other hand, engaged in the prohibited practice of law at the beginning of his judicial career, rather than at the end, and did so while simultaneously performing the duties of his office. We again emphasize the grave nature of a sitting judge engaging in the practice of law in violation of Canon 5G.
Judge Turner’s inappropriate intrusion into the personal life of a subordinate court employee is also a significant part of the pattern of misconduct evidencing unfitness for judicial office. Judge Turner’s actions toward Ms. Shelby do not comply with the standards of conduct with which Florida expects its judges to comply, as described in Canons 1 and 2A. Over a period of several months, Judge Turner made frequent unsolicited personal contact with Ms. Shelby — both in and outside of the work environment — and forced himself *909 into the life of Ms. Shelby and her young son despite Ms. Shelby’s frequent efforts to rebuff his advances. In his protracted interactions with Ms. Shelby, Judge Turner exploited his position as a judge for his own purposes in a grossly insensitive manner.
We have previously stressed the seriousness with which we take charges of judges intruding into the personal life of court employees. For example, in In re McAllister, 646 So.2d 178 (Fla.1994), we removed a judge who had, among other things, sexually harassed her judicial assistant. 646 So.2d at 178 (holding that, when considered together, sexual harassment, ex parte communications, and intentional abuse of public defender’s office warranted removal). In addition to the numerous sexual comments that she made to and about her assistant, we found that Judge McAllister had maintained an abusive work environment by asking her assistant to lunch every day — refusing to take no for an answer — and by asking her assistant to various non-work-related events. Id. Similarly, in In re Graziano, 696 So.2d 744 (Fla.1997), we removed a judge from office for, among other things, her treatment of court employees. 696 So.2d at 753 (holding that, when considered together and in light of previous discipline, judge’s abuse of office to influence hiring and promotion of personal friend, berating of court employees, and entering another judge’s courtroom during a hearing to berate court reporter warranted removal). We found that on several occasions, Judge Graziano had treated court employees inappropriately, including yelling at employees and threatening one with jail time, often for mistakes that were not the fault of the employee. Id. at 749. We concluded that although this action alone might not have warranted removal, the cumulative effect of Judge Graziano’s impropriety required her to be removed from office. More importantly, we cited the Panel’s “specific finding that [Judge Graziano] has demonstrated an inability to recognize the impropriety of her actions and ... a lack of veracity in her dialogue with the JQC.” Id. at 758.
Although Judge Turner’s conduct lacks the sexual component present in McAllis-ter and the hostility present in Graziano, it nonetheless demonstrates his failure to uphold the integrity of the judiciary and to recognize the impropriety of such behavior. Like Judge McAllister, Judge Turner’s intrusion into Ms. Shelby’s personal life was uninvited and pervasive. Judge Turner refused to take no for an answer on several occasions, including — like Judge McAllister — when he invited Ms. Shelby to lunch. Judge Turner also inserted himself into Ms. Shelby’s life outside of work by repeatedly asking to come to both the hospital where her son was being treated and to her home, as well as by intruding into a personal evening with Ms. Shelby and her son. Like Judge Graziano, Judge Turner evinced a failure to appreciate the impropriety of his actions at the time and even in retrospect failed to see that his advances were unwelcome. Moreover, Judge Turner’s interest in Ms. Shelby was well known throughout the court, causing Ms. Shelby extreme embarrassment and requiring changes to her professional life. Such actions, although not as extreme or ill-intentioned as those present in McAllis-ter and Graziano, nonetheless display an abuse of the judicial office.
Although minor compared to his other transgressions, Judge Turner’s inappropriate conduct during a court-cost hearing, as charged in count 12, is further evidence of Judge Turner’s defective judgment. In conduct violating Canons 1, 2A, and 333(3), when faced with a juvenile defendant who had failed to pay his court costs, Judge Turner arbitrarily selected an item of the *910 juvenile’s personal property — a fake diamond earring — and determined its value based upon a short conversation with the juvenile, offsetting the juvenile’s court costs in exchange for the earring. The courtroom is not a forum in which defendants may be required sua sponte by a judge to trade items of clothing or personal property in order to offset the costs assessed against them pursuant to our rules of court.
We base our decision to remove Judge Turner on this pattern of misconduct demonstrating Judge Turner’s unfitness to hold judicial office. See In re McMillan, 797 So.2d 560, 573 (Fla.2001) (holding that “the cumulative weight of the improprieties” can support removal “[e]ven if a single impropriety were considered insufficient in isolation”). Judge Turner’s violation of campaign finance laws, his defiance of the judicial canon prohibiting the practice of law by a judge, his highly inappropriate conduct toward Ms. Shelby, and his actions in open court undermining the decorum of the judiciary lead us to conclude that his conduct is “fundamentally inconsistent with the responsibilities of judicial office.” Graziano, 696 So.2d at 753.
CONCLUSION
We hold that Judge Turner is unfit to hold judicial office and that removal is the only appropriate sanction. For the reasons stated above, N. James Turner is hereby removed as a judge of Florida’s Ninth Judicial Circuit, effective upon this opinion becoming final.
It is so ordered.
PARIENTE, QUINCE, LABARGA, and PERRY, JJ., concur.
CANADY, C.J., concurs in result with an opinion, in which POLSTON, J., concurs.
LEWIS, J., recused.

. Due to an obvious clerical error, the charge and the Panel's findings refer to Canon 3A (3).