# Supreme Court of Florida

_____

No. SC14-383

_____

**INQUIRY CONCERNING A JUDGE, NO. 13-25 RE:**
**ANDREW J. DECKER, III.**

[March 2, 2017]
**<u>CORRECTED OPINION</u>**

PER CURIAM.

This matter is before the Court for review of the determination of the Florida

Judicial Qualifications Commission (JQC) that Circuit Judge Andrew J. Decker,

III, has violated certain Florida Bar Rules of Professional Conduct before his

judicial campaign and the Code of Judicial Conduct during his judicial campaign.

We have jurisdiction. See art. V, § 12, Fla. Const. We conclude that, with limited

exceptions, the JQC Hearing Panel's findings are supported by clear and

convincing evidence. For the violations in this case, the Hearing Panel

recommended a ninety-day suspension, public reprimand, and payment of costs of

the proceedings. Article V, section 12(c)(1) of the Florida Constitution provides

that this Court "may accept, reject, or modify in whole or in part the findings,

conclusions, and recommendations of the commission." We modify in part the

sanction recommended by the Hearing Panel and impose the following discipline on Judge Decker: a six-month suspension, public reprimand, and payment of costs of the proceedings.

## PROCEDURAL HISTORY

Judge Andrew J. Decker, III, took office as a circuit judge in the Third Judicial Circuit after a contested election in November 2012. On May 3, 2013, the JQC Investigative Panel issued a Notice of Investigation to Judge Decker informing him that the Investigative Panel was conducting an investigation into allegations of violation of a number of the Canons in the Code of Judicial Conduct governing judicial candidates and of the Rules of Professional Conduct governing attorneys. On August 22, 2013, the Investigative Panel held a probable cause hearing pursuant to Florida Judicial Qualifications Commission Rule 6(b) at which Judge Decker and his counsel appeared. On June 23, 2014, the Investigative Panel filed its Second Amended Notice of Formal Charges pursuant to the findings of the Investigative Panel.[1] The Second Amended Notice of Formal Charges alleged

---

1. The first notice of charges was filed as "Amended Notice of Formal Charges" on February 25, 2014. On April 24, 2014, the Investigative Panel filed "First Amendment to Amended Notice of Formal Charges." An "Amendment to Paragraph 7 of the Amended Notice of Formal Charges" was filed on May 23, 2014. The final notice of charges, denominated the "Second Amended Notice of Formal Charges," was filed on June 23, 2014, and served as the basis for the evidentiary hearing and the Hearing Panel's final order in this case.

violations of the Rules of Professional Conduct by then-attorney Decker's conduct as a practicing attorney, and further alleged violations of the Code of Judicial Conduct when then-attorney Decker was campaigning for the judgeship.

Charge 1 of the Second Amended Notice of Formal Charges alleged that on July 31, 2012, when then-attorney Decker was a candidate for a circuit court judgeship in the Third Judicial Circuit, while at a televised debate with his opponent, then-attorney Decker stated that he had never been accused of having a conflict of interest. The notice alleged that the statement was false because less than four months earlier, a formal complaint was filed with The Florida Bar by Daniel Dukes, a former client, alleging conflict of interest. The notice alleged that then-attorney Decker responded to that complaint with a twelve-page letter only two and one half months before the debate, and that the false statement made at the debate was not corrected. The foregoing conduct was said to violate the Code of Judicial Conduct Canons 7A(3)(b) (candidate shall act with impartiality, integrity, and independence) and 7A(3)(e)(ii) (candidate shall not knowingly misrepresent qualifications or facts concerning the candidate or opponent), and the Rules of Professional Conduct 4-8.4(c) (lawyer shall not engage in conduct involving

dishonesty or misrepresentation) and 4-8.2(b) (candidate for judicial office shall comply with applicable provisions of the Code of Judicial Conduct).[2]

Charge 3 alleged, in pertinent part, that at a judicial forum sponsored by the Lafayette County Republican Executive Committee, then-attorney Decker stated to the audience that he is a registered Republican, that his former affiliation with the Democratic Party was an error, and that he is "pro-life." It was alleged that these statements violated the Code of Judicial Conduct Canons 7A(1)(c) (candidate shall not make speeches on behalf of a political organization); 7C(3) (candidate should refrain from commenting on affiliation with any political party and must avoid conduct suggesting support of a political party or a political issue); Rule of Professional Conduct 4-8.2(b) (lawyer who is a candidate shall comply with applicable Canons of Judicial Conduct); and section 105.071(3), Florida Statutes (2011) (candidate for judicial office shall not publicly represent himself or herself as a member of any political party).

Charge 6 alleged that as an attorney, then-attorney Decker began representing Circuit Judge Paul Bryan in a lawsuit filed by TD Bank, N.A., against Judge Bryan, Daniel Dukes, and William Woodington, who were also represented

---

2. We discuss only those charges on which Judge Decker was found guilty. The Hearing Panel directed a verdict in Judge Decker's favor on Charge 2 and found him not guilty of Charges 4 and 5.

by then-attorney Decker. Charge 6 alleged that during his representation of Judge Bryan, then-attorney Decker was engaged in trial preparation in a suit brought by Wells Fargo Bank, N.A., against two of his other clients, Jean and Joan Cornell. That case was being heard by Judge Bryan, and it was alleged that then-attorney Decker failed to inform Bart Valdes, opposing counsel in the Wells Fargo suit, that then-attorney Decker and Judge Bryan had an attorney-client relationship. Charge 6 alleged that then-attorney Decker engaged in pretrial preparation and negotiation with Valdes up to a date very near the scheduled trial without ever disclosing his relationship with Judge Bryan. This conduct was alleged to violate Rule of Professional Conduct 4-8.4(d) (lawyer shall not engage in conduct prejudicial to the administration of justice); Rule 4-8.4(c) (lawyer shall not engage in conduct involving dishonesty, fraud, deceit, or misrepresentation); and Rules Regulating The Florida Bar Rule of Discipline 3-4.3 (commission by a lawyer of act that is unlawful or contrary to honesty and justice may constitute cause for discipline).

Charge 7 alleged a number of matters concerning then-attorney Decker's representation of Judge Bryan, Dukes, Woodington, and an entity owned by them called BWD Land Trust (BWD) arising out of the suit against these clients by TD Bank. The charge alleged that then-attorney Decker failed to explain to the three clients the implications of common representation and the advantages and risks involved. For example, the charge alleged that then-attorney Decker failed to

explain that joint guarantors are entitled to demand reimbursement from the others if one pays more than another. This failure was alleged to violate Rule of Professional Conduct 4-1.7(c) (attorney representing multiple clients in a single matter must explain implications of common representation and advantages and risks involved). It was also alleged that in this litigation, BWD owed TD Bank approximately $1.3 million secured by property in Bradford County and that the three clients were guarantors of this debt. The charge contended that during this litigation, then-attorney Decker had Dukes and Woodington execute quitclaim deeds to Judge Bryan, which put them at a negotiating disadvantage. By doing so, he allegedly violated Rule of Professional Conduct 4-1.7(a) (attorney must not represent a client if the representation will be directly adverse to another client or there is a substantial risk that lawyer's representation of one client will be materially limited by responsibilities to another client) and Rule 4-1.8(g) (lawyer of multiple clients shall not make an aggregate settlement unless each client gives informed consent in writing, and lawyer's disclosure shall include the existence and nature of all claims and the participation of each person in the settlement).

It was further alleged in Charge 7 that on August 10, 2011, then-attorney Decker sent an e-mail to Scott Thomas, the attorney representing TD Bank, stating that Judge Bryan might file for bankruptcy, which created a conflict with then-attorney Decker's other two clients, requiring his immediate withdrawal from

representing all three of them. This conduct was alleged to violate Rule of Professional Conduct 4-1.7(a) (attorney must not represent a client if the representation will be directly adverse to another client or there is a substantial risk that lawyer's representation of one client will be materially limited by responsibilities to another client).

When then-attorney Decker filed a bankruptcy petition for Judge Bryan, then-attorney Decker stated under oath that his law firm had no connection with the debtor, his creditors, or any other parties of interest, which was alleged in Charge 7 to be false, and in violation of Rule of Professional Conduct 4-3.3 (lack of candor toward the tribunal). Then-attorney Decker then filed an amended application to represent Judge Bryan in the bankruptcy case, clarifying that his firm had represented BWD, Dukes, Woodington, and Judge Bryan in the earlier-filed foreclosure action. However, in this amended application, then-attorney Decker did not mention that he continued to represent BWD, which was alleged to be a violation of Rule of Professional Conduct 4-3.3 (lack of candor toward the tribunal).

In addition, in Charge 7, the Investigative Panel alleged that shortly after the bankruptcy petition was filed for Judge Bryan, and while then-attorney Decker was still counsel for Dukes and Woodington, then-attorney Decker sent an e-mail on March 14, 2012, to Scott Thomas, counsel for TD Bank in the foreclosure suit filed

against all three clients. Judge Decker admitted to the fact and the text of the e-mail, which stated that then-attorney Decker consented to relief from the bankruptcy stay for TD Bank, but noted that TD Bank could still "pursue its remedies against the other two defendants," who were Dukes and Woodington. This conduct was alleged to violate Rules of Professional Conduct 4-1.7(a) (attorney must not represent a client if the representation will be directly adverse to another client), 4-1.8(b) (lawyer shall not use information relating to representation of one client to the disadvantage of another client without consent), and 4-1.9(b) (lawyer must not use information relating to representation of one client to the disadvantage of a former client).

Finally, Charge 7 contained allegations regarding four lawsuits filed on October 3, 2011, by John Vreeland, trustee of the Leland Bryan Revocable Living Trust, in Polk County. Three of the suits were filed against Judge Bryan and one suit was filed against Dukes and Woodington. The Second Amended Notice of Formal Charges alleged that in this litigation, Dukes, who was not represented in that case by then-attorney Decker, contended his signature on a promissory note for $235,400 was forged, thus creating a conflict of interest for then-attorney Decker's continued representation of the three clients, which was in violation of Rule of Professional Conduct 4-1.7(a) (lawyer must not represent a client if that representation is directly adverse to another client or the representation will be

materially limited by responsibilities to another client, a former client, or a third person). Charge 7 alleged that the claim of forgery by Dukes required then-attorney Decker's withdrawal from representation of all three clients.

The Second Amended Notice of Formal Charges, in Charges 8 through 16, which were treated by the Hearing Panel as one charge, made certain allegations of misconduct concerning then-attorney Decker's actions during litigation filed by Compass Bank. In that litigation, then-attorney Decker represented Woods Marina, LLC, Matthew Ellison, and Jennifer Ellison, who is also an attorney. It was alleged that in June 2010, then-attorney Decker filed an answer for these three clients and served Attorney Brent C. Siegel, who represented certain other defendants, including Job White and his wife, Frances Grace White, who were trying to reinstate, refinance, or buy the Compass Bank loan to save the condominium project for which the loan was made. It was alleged that unknown to Siegel's clients, the Ellisons began negotiations with Compass Bank to buy the loan for their own benefit.

During this litigation, then-attorney Decker and the attorney for Compass Bank moved to substitute the Ellisons' new entity, MJE Family Investments (MJE), as party-plaintiff, and the Ellisons, through MJE, voluntarily dismissed Siegel's clients, defendants Job and Frances Grace White. It was alleged that these actions and this substitution occurred after then-attorney Decker and Jennifer

Ellison met secretly with Siegel's client, Job White, at then-attorney Decker's office to discuss possible settlement of the case as to the Whites, and that pursuant to the secret settlement, the Whites were to provide funds that the Ellisons would use to help buy the Compass loan. At the secret meeting, White informed then-attorney Decker he had discharged Siegel, his counsel of record, but then-attorney Decker did not confirm this. The agreement reached with the Ellisons and the Whites was protected by a confidentiality provision that allowed it to be revealed only to the parties' counsel, even though White claimed he had no counsel. It was alleged that the Whites' counsel, Siegel, only learned of the secret deal in November 2010 when then-attorney Decker sent demand letters to Siegel's other clients to accept a settlement offer. All this conduct was alleged to violate Rule of Professional Conduct 4-4.2(a) (lawyer must not communicate about the subject of the representation with persons the lawyer knows are represented by counsel unless consent is obtained); Rule 4-3.4(a) (lawyer must not obstruct another party's access to documents or material that the lawyer knows or reasonably should know is relevant to the proceeding, or assist another person to do so); Rule 4-8.4(a) (lawyer shall not violate the Rules of Professional Conduct or knowingly assist or induce another to do so); Rule 4-8.4(c) (lawyer shall not engage in conduct involving dishonesty, fraud, deceit, or misrepresentation); and Rule of Discipline

3-4.3 (lawyer's conduct that is unlawful or contrary to the administration of justice is subject to discipline).

Charge 17 of the Second Amended Notice of Formal Charges was simply a summation of the Judicial Canons, Rules Regulating The Florida Bar, and the statute that the foregoing conduct was alleged to have violated.

After Judge Decker filed his answers to the charges, the parties engaged in extensive discovery and the case proceeded to an evidentiary hearing held December 10-12, 2014, before the Hearing Panel. The Hearing Panel issued its "Findings, Conclusions and Recommendations by the JQC Hearing Panel" (Findings) on March 3, 2015.

## FINDINGS, CONCLUSIONS AND RECOMMENDATIONS BY THE JQC HEARING PANEL

In its Findings, the Hearing Panel correctly noted that the burden of proof for violation of the Rules Regulating The Florida Bar and the Code of Judicial Conduct is clear and convincing evidence. See In re Turner, 76 So. 3d 898, 901 (Fla. 2011). All the charges at issue, as set forth in the Second Amended Notice of Formal Charges, concern Judge Decker's conduct as a private attorney and during his candidacy for circuit judge. The Hearing Panel also correctly determined that a sitting judge can be disciplined through the JQC for rule and statutory violations that occurred before the judge took the bench. See In re Henson, 913 So. 2d 579, 588 (Fla. 2005) ("Misconduct committed by an attorney who subsequently

- 11 -

becomes a judge falls within the subject-matter jurisdiction of this Court and the JQC, no matter how remote."); see also In re Watson, 174 So. 3d 364, 369 (Fla. 2015) ("[T]he Commission has constitutional authority to investigate pre-judicial acts and recommend to this Court the removal (for unfitness) or reprimand (for misconduct) of a sitting judge." (alteration in original) (quoting In re Davey, 645 So. 2d 398, 403 (Fla. 1994))), cert. denied, 136 S. Ct. 863 (2016). The Hearing Panel's Findings also noted that Judge Decker agreed that some of his conduct was in violation of the various rules and canons. Based on Judge Decker's admissions and the evidence presented, the Hearing Panel found Judge Decker guilty of Charges 1, 3, 6, 7, and 8, which also encompasses Charges 9-16.

The Hearing Panel found as to Charge 1 that then-attorney Decker's statement at a televised debate that he had never been accused of a conflict of interest was false and was not corrected during the debate or publicly thereafter. The Hearing Panel found that Judge Decker admitted his guilt and that this conduct violated Judicial Canons 7A(3)(b) and 7A(3)(e)(ii), and Rules of Professional Conduct 4-8.4(c) and 4-8.2(b).

The Hearing Panel found as to Charge 3, in pertinent part, that at a Lafayette County Republican Executive Committee candidates' forum then-attorney Decker publicly stated he was affiliated with the Republican Party and that his former affiliation with the Democratic Party was an error he had corrected. Judge Decker

admitted making the statements. The Hearing Panel found this conduct violated

Code of Judicial Conduct Canons 7A(1)(c) and 7C(3), Rule of Professional

Conduct 4-8.2(b), and section 105.071(3), Florida Statutes (2011). The Hearing

Panel did not find a violation regarding then-attorney Decker's statement that he is

"pro-life."

As to Charge 6, the Hearing Panel found Judge Decker guilty based on the

evidence of his failure to notify opposing counsel in the Wells Fargo case that he

represented the presiding judge, Judge Bryan, in other litigation. The Hearing

Panel found that in November 2010, Judge Bryan, the presiding judge in a

foreclosure case brought by Wells Fargo Bank against then-attorney Decker's

clients, the Cornells, set the case for trial for January 25, 2011. The Hearing Panel

found that in December 2010, then-attorney Decker began representing Judge

Bryan in the TD Bank suit brought against Judge Bryan, Dukes, and Woodington.

The Hearing Panel found that during the time leading up to the trial date in the

Wells Fargo case, then-attorney Decker and Wells Fargo's attorney Bart Valdes

engaged in trial preparation and settlement negotiations. The Hearing Panel found

that then-attorney Decker asked Valdes to agree to a continuance, which was

agreed upon, and submitted an order for a continuance to Judge Bryan on January

24, 2011. During this time, then-attorney Decker did not disclose to Valdes the

fact that then-attorney Decker was representing Judge Bryan in separate litigation.

The Hearing Panel concluded that this conduct was proven and that it prejudiced opposing counsel. This conduct was found to have violated Rules of Professional Conduct 4-8.4(d) and 4-8.4(c), and Rule of Discipline 3-4.3.

The Hearing Panel found Judge Decker guilty of Charge 7, which involved then-attorney Decker's common representation of Judge Bryan, Dukes, and Woodington, as well as their trust, BWD, in litigation arising from land purchases in Hamilton County and Bradford County. Judge Decker agreed that he failed to provide a proper explanation to these clients concerning his common representation of all of them, and that he should have withdrawn from representing all of them. The Hearing Panel found that then-attorney Decker failed to explain to them the advantages and, equally if not more importantly, the risks involved when one joint guarantor is entitled to demand contribution from the other joint guarantors if one pays more than another. The Hearing Panel also found that then-attorney Decker failed to have the clients execute written waivers of conflict, did not have a written contract with the clients, and did not keep Dukes and Woodington advised in any respect about the litigation. This conduct was found to have violated Rule of Professional Conduct 4-1.7(c).

The Hearing Panel also found as part of Charge 7 that then-attorney Decker's actions in sending an August 10, 2011, e-mail to the attorney representing TD Bank, stating that Judge Bryan might file for bankruptcy, created

a conflict with then-attorney Decker's other clients and required then-attorney Decker's immediate withdrawal from representing all three of them. This conduct was found to violate Rule of Professional Conduct 4-1.7(a). In addition, relative to Charge 7, the Hearing Panel found that in the TD Bank foreclosure suit against his clients, then-attorney Decker had Dukes and Woodington execute quitclaim deeds of the subject property to Judge Bryan, which the Hearing Panel found divested Dukes and Woodington of ownership and placed them at a negotiating disadvantage. This conduct was found to violate Rules of Professional Conduct 4-1.7(a) and 4-1.8(g). These violations were found even though Judge Decker explained that he sought the quitclaim deeds only to avoid additional judgment liens being placed against the property in order that he might more successfully negotiate a resolution of the case by deed in lieu of foreclosure.

The Hearing Panel also found that then-attorney Decker violated Rule 4-1.7(a) by continuing to represent all three clients after separate lawsuits were filed in Polk County by the Leland Bryan Revocable Living Trust against Bryan, Dukes, and Woodington, in which then-attorney Decker was not representing Dukes. In that litigation, Dukes claimed his signature had been forged on the note at issue, which the Hearing Panel concluded created a conflict among the defendants and that then-attorney Decker should have withdrawn from representing all these clients. The Hearing Panel also found that further conflict was created when then-

attorney Decker filed a chapter 11 bankruptcy petition for Judge Bryan, which created conflict between the three clients. In the filing, then-attorney Decker made inaccurate statements in the pleadings, which were filed while he still represented Dukes and Woodington, that then-attorney Decker's firm had no connection with any creditor or other parties in interest. The Hearing Panel found that this conduct violated Rules of Professional Conduct 4-1.7, 4-1.8(g), 4-3.3, and 4-1.9(b).

Also as to Charge 7, the Hearing Panel found, based on evidence and Judge Decker's admitted conduct, that shortly after Judge Bryan's bankruptcy petition was filed, and while then-attorney Decker was still representing Dukes and Woodington, then-attorney Decker sent an e-mail to counsel for TD Bank in the foreclosure suit consenting to relief from the bankruptcy stay for TD Bank, and noting that TD Bank could still "pursue its remedies against the other two defendants," who were Dukes and Woodington. This conduct was found to violate Rules of Professional Conduct 4-1.7(a), 4-1.8(b), and 4-1.9(b).

The Hearing Panel found Judge Decker guilty of Charge 8 (including allegations in Charges 8 through 16) involving a foreclosure case brought by Compass Bank in which then-attorney Decker represented Matthew and Jennifer Ellison and their entity, Woods Marina, LLC. Attorney Brent Siegel represented, among others, Kelly Shore, Ted Burt, and Job and Frances Grace White. Siegel's clients were attempting to reinstate, refinance, or buy the Compass Bank loan to

save the condominium project for which the monies were borrowed. The Hearing Panel found that unknown to Siegel and his other clients, the Ellisons began their own discussions to buy the Compass Bank note, thus becoming competitors with the other defendants. The Hearing Panel found that without Siegel's knowledge or approval, then-attorney Decker and his client, Jennifer Ellison, met in secret with Siegel's client, Job White, at then-attorney Decker's office, with then-attorney Decker present, to discuss possible settlement, in which the Whites would provide some funds that the Ellisons would use toward purchasing the note. If this succeeded, the Ellisons would dismiss claims against the Whites. The Hearing Panel found based on testimony by Judge Decker and White that, at that meeting, White told then-attorney Decker he had no counsel, or had discharged his counsel, but then-attorney Decker made no effort to confirm that. The Hearing Panel further found that a settlement, with a confidentiality clause, was reached with Ellison and the Whites, which resulted in MJE, a newly created entity by the Ellisons, being substituted as plaintiff in the Compass Bank litigation. Siegel testified, and the Hearing Panel found, that he did not learn of the secret deal until more than a month later when then-attorney Decker sent a letter to Siegel making demands of Siegel's other clients. The Hearing Panel found that this conduct violated Rules of Professional Conduct 4-4.2(a), 4-3.4(a), 4-8.4(a), 4-8.4(c), and Rule of Discipline 3-4.3.

In its Findings, the Hearing Panel concluded that Judge Decker exhibited a pattern of behavior that evidenced a lack of ethical judgment and a lack of understanding and concomitant contrition about the harm caused to his clients and the public's trust. The Hearing Panel stated, "The cumulative effect of these misdeeds coupled with the fact that Judge Decker has been reprimanded by The Florida Bar in the past, evinces a lack of ability to identify situations that lead to the appearance of impropriety."[3] However, the Hearing Panel found based on testimony concerning Judge Decker's present ability as a circuit judge that "he should be given an opportunity to continue to serve the citizens." The Hearing Panel concluded by recommending a public reprimand, suspension without pay for ninety days, and an order to pay costs of the proceedings.

After the Hearing Panel's Findings were filed, this Court issued an order to Judge Decker to show cause why the recommended action should not be granted. Judge Decker responded that he accepted the recommended discipline and "looks forward to continuing to serve the public as a circuit court judge following his term of suspension." Thereafter, we issued a second order to Judge Decker to show cause as to why the Court should not disapprove the recommended sanction of a

---

3. The details of the prior discipline were not made clear in the record and when asked about the earlier discipline, Judge Decker conceded he had been disciplined in 1985 but could not recall the reason.

public reprimand, ninety-day suspension, and costs as well as consider a more severe sanction instead, including removal from office. Both Judge Decker and the JQC responded in detail to the second order to show cause.

## ANALYSIS

We review the findings of the Hearing Panel to determine if they are supported by clear and convincing evidence. The "standard for clear and convincing evidence falls between 'a preponderance of the evidence' and 'beyond . . . reasonable doubt.' " In re Turner, 76 So. 3d at 901 (alteration in original) (quoting In re Graziano, 696 So. 2d 744, 753 (Fla. 1997)). "If the findings meet this intermediate standard, then they are of persuasive force and are given great weight." Id. We further review the recommendation of discipline to determine "whether it should be approved or whether other discipline is appropriate." In re Renke, 933 So. 2d 482, 486 (Fla. 2006). We conclude that— except as to one rule violation found under Charge 3, one rule violation found under Charge 7, and the five rule violations found under Charge 8—the Hearing Panel had before it clear and convincing evidence of the violations of those rules that the Hearing Panel found then-attorney Decker violated.

Then-attorney Decker's conduct alleged in Charge 1—that while campaigning he falsely stated that he had never been accused of a conflict of interest—was proven by clear and convincing evidence. This false statement,

- 19 -

which he did not timely correct, violated Code of Judicial Conduct Canons 7A(3)(e)(ii), which prohibits a candidate from knowingly misrepresenting facts concerning the candidate or opponent, and 7A(3)(b), which requires a candidate to act with integrity. By violating these Canons, then-attorney Decker also violated Rule of Professional Conduct 4-8.2(b), which requires candidates to comply with the applicable Canons of Judicial Conduct. Further, clear and convincing evidence established that the conduct violated Rule of Professional Conduct 4-8.4(c), which prohibits a lawyer from engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation.

Then-attorney Decker's conduct alleged in Charge 3—that he publicly announced his affiliation with the Republican Party—was also proven and violated Canon 7C(3) of the Code of Judicial Conduct, which requires a candidate for judicial office to refrain from commenting on his or her affiliation with or support of a political party.[4] By violating this Canon, then-attorney Decker also violated Rule of Professional Conduct 4-8.2(b), which requires candidates to comply with

---

4. The Second Amended Notice of Formal Charges alleged that then-attorney Decker's conduct set forth in Charge 3 also violated Canon of Judicial Conduct 7A(1)(c), which prohibits a judicial candidate from making speeches on behalf of a political organization. However, the Hearing Panel did not explain in its Findings how then-attorney Decker's comment constituted a "speech" on behalf of a political organization. We do not find that the conduct alleged and proven in Charge 3 violated this particular subsection of Canon 7A.

the applicable Canons of Judicial Conduct. Finally, this conduct violated section 105.071(3), Florida Statutes, which prohibits a candidate for judicial office from publicly representing himself as a member of a political party.[5]

The evidence of the conduct alleged in Charge 6 was clear and convincing that then-attorney Decker violated Rule of Professional Conduct 4-8.4(d), which prohibits conduct in connection with the practice of law that is prejudicial to the administration of justice. The evidence was undisputed that in a case pending before Judge Bryan, then-attorney Decker failed to inform Wells Fargo's counsel about his representation of Judge Bryan, even though the case was set for trial and the parties were both preparing for trial and attempting to negotiate a settlement, which ultimately occurred. Wells Fargo's counsel testified that he did not learn

---

5. Judge Decker contends that the rule and statute are a violation of his right to free speech. However, we decline to rule on the constitutionality of section 105.071 or the provisions of the Code of Judicial Conduct that prohibit a candidate from publicly stating his or her affiliation with or support for a political party. The constitutional claim was not fully litigated in the JQC proceeding. Moreover, as to the challenge to section 105.071(3), the State of Florida was not given an opportunity to be heard as to the constitutionality of the state statute. Although this was not a state judicial proceeding for which notice to the State Attorney General is required, see section 86.091, Florida Statutes, we are reluctant to rule on the constitutionality of a statute without the State having had an opportunity to make its position known. We also decline to rule on Judge Decker's constitutional claim pertaining to that portion of Charge 3 in which the JQC charged Judge Decker with violating Canon 7C(3) by stating his position as "pro-life." This Canon cautions a candidate to avoid expressing an opinion on a political issue. The JQC did not expressly rule on this portion of the charge. Thus, we do not reach any constitutional issues regarding Canon 7C(3).

that then-attorney Decker was representing Judge Bryan at the time he presided over the Wells Fargo case until approximately one year later when it was mentioned to him by another attorney. If he had learned of it during the litigation, Wells Fargo's counsel testified, he would have moved Judge Bryan to recuse himself and have the case assigned to another judge, which could have delayed getting a trial date, if such had been necessary. Accordingly, we find that then-attorney Decker's conduct in this regard did violate Rule of Professional Conduct 4-8.4(d) by engaging in conduct prejudicial to the administration of justice.

We also find that then-attorney Decker's conduct violated Rule of Professional Conduct 4-8.4(c), which prohibits a lawyer, in pertinent part, from engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation. Failing to advise opposing counsel that he was representing Judge Bryan in another case and that Judge Bryan could not preside over the upcoming trial is a form of dishonesty or misrepresentation by silence. By asking Wells Fargo's counsel for agreement to a short continuance, as then-attorney Decker did immediately before the scheduled trial date, rather than advising counsel that the case would not be going to trial as scheduled because of then-attorney Decker's attorney-client relationship with Judge Bryan, then-attorney Decker misled opposing counsel concerning the status of the litigation. Opposing counsel had an absolute right to know of the attorney-client relationship that the presiding judge had with then-

attorney Decker, and had the right to make the decision, along with his client, as to whether his client would be prejudiced by the existence of that relationship. Because of then-attorney Decker's silence, this could not occur.

Judge Decker's defense to Charge 6 that he did not notify Wells Fargo's counsel about his representation of Judge Bryan because the case was likely to be settled—and that Judge Bryan's actions in the case were essentially "ministerial"—are not defenses to violation of these rules. Nor is it a defense to this conduct, as asserted by Judge Decker, that he did not feel he was getting any benefit or advantage in the Wells Fargo litigation from his relationship with Judge Bryan. Regardless of whether then-attorney Decker believed the case would settle or that he was not getting any benefit, the evidence established that Wells Fargo and its attorney expended time and energy preparing for a trial they believed was imminent when, in fact, Judge Bryan would not have been able to hold the scheduled trial. This occurred for no other reason than then-attorney Decker's lack of candor with counsel and his misrepresentation by silence.

Rule of Discipline 3-4.3, also found to have been violated by then-attorney Decker's conduct, is a general rule stating, in pertinent part, that commission of an act by a lawyer that is contrary to honesty and justice may constitute a cause for discipline. Because then-attorney Decker was found to have violated Rule of

Professional Conduct 4-8.4, his conduct also falls within the purview of Rule of Discipline 3-4.3.

Then-attorney Decker's conduct, as alleged in Charge 7, in the common representation of Judge Bryan, Dukes, and Woodington, was also proven by clear and convincing evidence to have violated the Rules of Professional Conduct concerning conflict of interest and proper attorney conduct in common representation of multiple clients. Judge Decker testified that TD Bank's suit against his three clients—Dukes, Woodington, and Judge Bryan as Trustees of the BWD—arose out of a loan made to secure the purchase of certain Bradford County property, and that each client had personally guaranteed the loan. Judge Decker agreed that the BWD trust agreement contained an indemnification provision that if one trustee pays more than his share, the other trustees would owe the paying trustee pro rata. Accordingly, each client had the right to be fully informed about the risk of common representation in light of the possible conflicts that could arise due to the obligations of the trustees to each other. Judge Decker conceded during his testimony that he failed to adequately inform his clients concerning the benefits and risks of this common representation.

Judge Decker also testified that he had no fee agreement with any of the three clients, that he had no initial conference with Dukes or Woodington, as Trustees, and that procedurally, he would discuss matters with Judge Bryan, who

then-attorney Decker believed would then communicate with Dukes and Woodington. Judge Decker testified that he thought this consultation with Judge Bryan was sufficient. Judge Decker also testified that he did not think there was any conflict in the common representation because Judge Bryan was the party who would pay most of the money owed pursuant to any judgment or settlement in the case. However, Judge Decker conceded that in light of the grievance filed claiming conflict of interest, and in light of the confusion he believed Dukes experienced, he should have met personally with the three clients and should have obtained a written waiver of conflict after explaining to them the common interests and risks involved.

Clear and convincing evidence also established that then-attorney Decker had Dukes and Woodington execute quitclaim deeds to Judge Bryan in the Bradford County foreclosure suit brought by TD Bank against Judge Bryan, Dukes, Woodington, and BWD. Judge Decker explained that he sought these deeds because Dukes had several judgments against him, and was subject to others being placed, which would be a cloud on the title to the property that then-attorney Decker hoped to deed to the plaintiff in lieu of foreclosure in order to reduce any deficiency judgments against all three clients. Judge Decker testified that the deeds were not done to benefit Judge Bryan, but to benefit all three clients in any possible settlement of the foreclosure action. However, the evidence established

that then-attorney Decker did not advise Dukes or Woodington that by doing so, they would lose their interest in the property but still be jointly and severally responsible for the debt owed. The Hearing Panel found this conduct violated Rule of Professional Conduct 4-1.7(a), which includes prohibition against representation of a client if that representation (1) will be directly adverse to another client or (2) there is a substantial risk that representation of one client will be materially limited by responsibilities to another client or former client.[6]

Even though then-attorney Decker had a benign reason for seeking the quitclaim deeds from two of his clients in favor of the third, this does not excuse then-attorney Decker's failure to fully advise all his clients of not only the benefits, but the risks, of common representation, especially when, as here, the clients are jointly and severally responsible for payment of debt incurred to purchase the property. Thus, we agree with the Hearing Panel that clear and convincing evidence also demonstrated that then-attorney Decker's conduct in his common

---

6. The Second Amended Notice of Formal Charges alleged that then-attorney Decker's conduct set forth in Charge 7 also violated Rule of Professional Conduct 4-1.8(g), which prohibits a lawyer who represents two or more clients from making an aggregate settlement unless each client gives informed consent after the lawyer discloses the existence and nature of all claims involved and the participation of each person in the settlement. However, the Hearing Panel did not explain in its Findings how the partial settlement between Decker's clients constituted an "aggregate settlement" within the meaning of the rule. We do not find that the conduct alleged and proven in Charge 7 violated Rule of Professional Conduct 4-1.8(g).

representation of Dukes, Woodington, and Judge Bryan violated Rule of Professional Conduct 4-1.7(c). That rule provides that when representing multiple clients in a single matter, "the consultation must include an explanation of the implications of the common representation and the advantages and risks involved."

The Hearing Panel also correctly found that then-attorney Decker violated Rule of Professional Conduct 4-1.7(a) by continuing to represent all three clients after separate litigation was brought by the Leland Bryan Revocable Living Trust against Judge Bryan, Dukes, and Woodington in Polk County, and when Dukes claimed his signature had been forged on the note at issue. Although then-attorney Decker was not representing Dukes in that case, Dukes' claim of forgery raised conflicts among the three clients, whom then-attorney Decker continued to represent. The Hearing Panel correctly concluded that then-attorney Decker should have withdrawn from representation of all three clients when these conflicts became apparent, and that his failure to do so violated Rule of Professional Conduct 4-1.7(a). Instead of withdrawing from representation of all three clients, then-attorney Decker ultimately withdrew from representing Dukes and Woodington but continued to represent Judge Bryan. Clear and convincing evidence established the facts underlying this portion of Charge 7 and we agree with the Hearing Panel that then-attorney Decker should have withdrawn from representing all three clients based on this obvious conflict among the three.

As to Charge 7, clear and convincing evidence established that then-attorney Decker notified counsel for TD Bank some months before filing the bankruptcy action for Judge Bryan that Judge Bryan was contemplating bankruptcy. We agree with the Hearing Panel that this created an immediate conflict of interest between Judge Bryan and the other clients requiring then-attorney Decker to withdraw from representing all three of them. This conduct violated Rule of Professional Conduct 4-1.7(a) because bankruptcy by Judge Bryan would shield him while leaving the other two clients vulnerable to the suit by TD Bank, and jointly and severally liable for the entire loan amount. Judge Decker testified in his defense that Woodington was also considering bankruptcy, but Judge Decker agreed that filing bankruptcy for Woodington would have adversely affected the substantial debt Woodington owed to Judge Bryan. Judge Decker testified he did not think this was a conflict because Judge Bryan "did not ask me to do anything with respect to that [debt]" and because Dukes and Woodington had their own bankruptcy counsel. Even so, the defense that Dukes and Woodington could have filed for bankruptcy too, or that Woodington sought other counsel to advise him on bankruptcy, does not excuse or eliminate the conflict of interest violation established by the foregoing conduct.

Clear and convincing evidence also established that then-attorney Decker filed a bankruptcy petition and an application to appear as counsel in the

bankruptcy case for Judge Bryan in which then-attorney Decker incorrectly stated that he had no connection with any creditors of Judge Bryan or other parties of interest. An amended application for representation was filed noting then-attorney Decker's former representation of Dukes, Woodington, and BWD in a suit brought by TD Bank, but failing to disclose that then-attorney Decker continued to represent the BWD trust and that then-attorney Decker had previously represented Judge Bryan, Dukes, and Woodington in other lawsuits. This conduct violated Rule of Professional Conduct 4-3.3, which makes it a violation for a lawyer to make a false statement of material fact to a tribunal or fail to correct such a false statement. These facts were admitted by Judge Decker and this violation was established by clear and convincing evidence. However, Judge Decker's defense that the omissions were inadvertent, which was also the opinion of the bankruptcy judge who testified on Judge Decker's behalf, diminishes the fact that the violation occurred.

Also in Charge 7, the Hearing Panel alleged and the evidence demonstrated that before being allowed to withdraw as counsel for Woodington and Dukes, and shortly after the bankruptcy petition was filed for Judge Bryan, then-attorney Decker sent an e-mail to counsel for TD Bank in the foreclosure suit related to the loan on the Bradford County property. Judge Decker admitted that in the e-mail he stated that he consented to relief from the bankruptcy stay for TD Bank, but noted

that TD Bank could still "pursue its remedies against the other two defendants." Judge Decker denied that this e-mail to TD Bank counsel was an "invitation" for TD Bank to pursue claims against Dukes and Woodington, and said that the e-mail was just a statement of the law and that TD Bank was already going to look to them for payment. The attorney for TD Bank also testified at the hearing that he understood the e-mail as simply stating a known fact regarding those two defendants.

Regardless of whether it was a known fact that TD Bank was pursuing and would continue to pursue its remedies against Dukes and Woodington, defendants who were not protected by a bankruptcy stay, this e-mail violated Rule of Professional Conduct 4-1.7(a), which prohibits a lawyer from representing a client if that representation is directly adverse to another client. Even though both lawyers knew that TD Bank was pursuing and would continue to pursue Dukes and Woodington, the e-mail pointedly reminded TD Bank's counsel of that fact to the possible detriment of Dukes and Woodington. The Hearing Panel correctly found that the e-mail also violated Rules of Professional Conduct 4-1.8(b) and 4-1.9(b), which prohibit a lawyer from using information relating to the representation of one client, or former client, to the disadvantage of another client or former client.

In sum, as to Charge 7, we conclude that clear and convincing evidence supports the Hearing Panel's findings that then-attorney Decker's conduct in

relation to his common representation of clients Dukes, Woodington, and Judge Bryan violated a number of the Rules Regulating The Florida Bar concerning representation of multiple clients, conflicts of interest, and candor to the tribunal.

Consolidated Charges 8 through 16 dealt with a foreclosure case brought by Compass Bank in which then-attorney Decker represented Matthew and Jennifer Ellison and their entity, Woods Marina, LLC. The Hearing Panel concluded that "[t]hrough a complex series of events, Judge Decker became involved in secret meetings with some, but not all, parties" and violated Rule of Professional Conduct 4-4.2(a), which prohibits communication with a person represented by other counsel without consent of that counsel. The Hearing Panel found relative to these same facts that then-attorney Decker violated Rule of Professional Conduct 4-3.4(a), which, in pertinent part, prohibits a lawyer from obstructing another party's access to evidence or concealing a document or material that the lawyer knows or reasonably should have known is relevant to a pending matter, or assisting another person in doing so.

We conclude that one of the most serious violations found by the Hearing Panel—Charge 8 relating to prohibited communication with a represented party— is not supported by the evidence. Rule of Professional Conduct 4-4.2(a) requires that an attorney not meet with a person counsel knows is represented about the subject of the representation without permission from that person's counsel. The

evidence established that then-attorney Decker, along with his client, Jennifer Ellison, who is also an attorney, met with Job White to discuss possible settlement of a portion of the Compass Bank litigation. However, the evidence is uncontroverted that then-attorney Decker was directly and unequivocally informed by White that he was no longer represented by counsel of record Brent Siegel.[7]

We conclude that then-attorney Decker did not have an obligation to confirm that White was no longer represented by counsel. We also conclude that White's status as an unrepresented party was not dependent upon his former counsel's compliance with the requirements of Florida Rule of Judicial Administration 2.505(f)(1) regarding withdrawal of an attorney. A party who like White has decided that he no longer desires to be represented by counsel should not be chained to counsel for purposes of Rule of Professional Conduct 4-4.2(a) until counsel withdraws under Florida Rule of Judicial Administration 2.505(f)(1). And a lawyer like then-attorney Decker should not be required to further investigate the status of the representation once the party has stated unequivocally that he is not represented by counsel. See In re Users Sys. Servs, Inc., 22 S.W.3d 331, 334-35 (Tex. 1999) (holding both that (a) rule of professional responsibility prohibiting communication by an attorney with a person represented by other counsel

_____

7. Siegel had represented Job and Frances Grace White, Frederic and Kelly Shore, and others in the foreclosure action.

ordinarily "does not require an attorney to contact a person's former attorney to confirm the person's statement that representation has been terminated before communicating with the person" and that (b) "the client's right to terminate the relationship" is not "limited by the attorney's responsibilities to a court as counsel of record for the client"). We therefore disagree with the Hearing Panel's conclusion that then-attorney Decker's conduct violated Rule of Professional Conduct 4-4.2(a).[8]

We further conclude that the related violation for improperly withholding information from White's prior counsel is not supported by the evidence. Rule of Professional Conduct 4-3.4(a), in pertinent part, prohibits a lawyer from obstructing another party's access to evidence or concealing a document or material that the lawyer knows or reasonably should have known is relevant to a pending matter, or assisting another person in doing so. The evidence established that then-attorney Decker facilitated a confidential settlement agreement between

---

8. The concurrence erroneously relies on The Florida Bar v. Feinberg, 760 So. 2d 933 (Fla. 2000), to support the conclusion that then-attorney Decker violated Rule 4-4.2(a). Feinberg is readily distinguishable. First, in Feinberg there was no challenge to the referee's conclusion that a violation of the rule had been committed. Our analysis in Feinberg therefore necessarily took the violation as established, and the case contains no holding regarding the circumstances that support finding a violation of the rule. Second, we concluded that Feinberg "exercised poor judgment by affirmatively misleading and being untruthful with opposing counsel, and continuing to meet with the defendant after realizing that, contrary to the defendant's statements, he was represented by counsel." Id. at 939. The circumstances present here are wholly dissimilar.

his client and the Whites to protect the document from disclosure. However, there is no evidence that then-attorney Decker unlawfully obstructed access to evidence or concealed any document from opposing counsel. We therefore disagree with the Hearing Panel's conclusion that then-attorney Decker's conduct in this regard violated Rule of Professional Conduct 4-3.4(a); Rule 4-8.4(a), which prohibits a lawyer from violating the Rules of Professional Conduct or assisting another to do so; Rule 4-8.4(c), which prohibits a lawyer from engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation; and Rule of Discipline 3-4.3, which prohibits the commission of an act contrary to justice.

The forgoing violations found in Charges 1, 3, 6, and 7 were established by clear and convincing evidence and support the imposition of a serious sanction in this case, which we discuss next.

## DISCIPLINE

The Hearing Panel recommended a ninety-day suspension, public reprimand, and payment of costs of the proceedings as the discipline to be imposed for the numerous violations discussed above. We are aware that in the past, a single instance of campaign violation has warranted only a public reprimand, or a reprimand and a fine. See, e.g., In re Dempsey, 29 So. 3d 1030, 1031, 1034 (Fla. 2010) (public reprimand warranted where Dempsey misrepresented her position and qualifications during her campaign); In re Colodny, 51 So. 3d 430, 432-33

- 34 -

(Fla. 2010) (campaign finance violation based on advice of counsel and interpretation of statutes warranted a reprimand and a fine).  For multiple campaign finance violations, this Court has imposed more severe discipline.  See, e.g., In re Rodriguez, 829 So. 2d 857, 861 (Fla. 2002) (imposing a four-month suspension, $40,000 fine, costs, and a public reprimand for multiple campaign violations).

Judge Decker's misconduct unquestionably warrants the imposition of a serious sanction.  In addition to campaign violations, then-attorney Decker (1) violated the Rules of Professional Conduct in failing to advise opposing counsel in the Wells Fargo litigation that he was currently representing the presiding judge in other litigation; (2) violated numerous Rules of Professional Conduct concerning conflict of interest in common representation, including failing to counsel and advise the three clients of the risks and advantages of common representation, failing to withdraw when conflicts were apparent, engaging in representation of one client to the detriment of other current or former clients, reminding opposing counsel in the TD Bank case that even though Judge Bryan was in bankruptcy court, TD Bank could still pursue its claims against Dukes and Woodington; and (3) violated the Rules of Professional Conduct requiring candor to the tribunal by incorrectly stating the status of his representation of Dukes, Woodington, and BWD trust on filings made with the bankruptcy court in Judge Bryan's case.

When it became apparent numerous times that there was conflict among then-attorney Decker's clients, then-attorney Decker should have immediately withdrawn from all representation. His inability to understand the serious conflict that existed, and to recognize that conflict when it became apparent on more than one occasion, demonstrates a critical lack of care concerning his clients.

In addition, there were other serious violations of the Rules of Professional Conduct, including then-attorney Decker's failure to advise opposing counsel in the Wells Fargo case that then-attorney Decker had undertaken representation of Judge Bryan, the presiding judge in the Wells Fargo case. All the violations established by the evidence in this case demonstrate a pattern of poor judgment, and lack of concern for jointly represented clients and for other counsel and their clients. Judge Decker violated numerous Rules of Professional Conduct and Canons of Judicial Conduct, as well as a state statute, and has "exhibited a pattern of behavior that evidences a lack of ethical judgment, along with a lack of understanding and concomitant contrition about the harm caused to his clients and to the public's trust in the legal system," as the Hearing Panel found. The Hearing Panel was also concerned, as are we, by the fact that Judge Decker was reprimanded by The Florida Bar in the past. This prior discipline, along with the numerous violations proven in this case, demonstrate that Judge Decker "evinces a lack of ability to identify situations that lead to the appearance of impropriety."

However, no evidence suggests that any of Judge Decker's misconduct in the practice of law caused significant harm to a client or another party. Significant harm is, of course, not necessary to establish an ethical violation. But the absence of such harm is a relevant consideration in determining the appropriate sanction to be imposed. Similarly, simple errors should be treated less severely than willful misrepresentations. So Judge Decker's culpability for bankruptcy court filings containing misstatements is certainly diminished by the fact that the misstatements were inadvertent.

This proceeding is not for the purpose of inflicting punishment, but to gauge a judge's fitness to serve. See, e.g., In re McMillan, 797 So. 2d 560, 571 (Fla. 2001). To make this determination, we examine judicial misconduct for present fitness to hold office "from two perspectives: its effect on the public's trust and confidence in the judiciary as reflected in its impact on the judge's standing in the community, and the degree to which past misconduct points to future misconduct fundamentally inconsistent with the responsibilities of judicial office." In re Murphy, 181 So. 3d 1169, 1177 (Fla. 2015) (quoting In re Sloop, 946 So. 2d 1046, 1055 (Fla. 2006)). Although the series of acts by Judge Decker involving misconduct requires the imposition of a significant sanction, we have concluded that it does not merit removal from office. The conduct unquestionably is "conduct unbecoming a member of the judiciary" but it does not "demonstrat[e] a

- 37 -

present unfitness to hold office." Art. V, § 12(c)(1), Fla. Const. For all these reasons, and based on the seriousness and cumulative nature of the numerous violations proven, we impose on Judge Decker a six-month suspension, public reprimand, and payment of costs of the proceedings.

**CONCLUSION**

Accordingly, due to the pattern of misconduct involving numerous separate and cumulative violations proven, Judge Andrew J. Decker, III, is hereby suspended without pay for six months from his duties as a judge of the Third Judicial Circuit effective immediately. We order Judge Decker to pay the costs of these proceedings, and we remand this case to the JQC for a determination of the amount of such costs. We also command Judge Decker to appear before this Court for the administration of a public reprimand at a time to be set by the Clerk of this Court.

It is so ordered.

LABARGA, C.J., and QUINCE, CANADY, POLSTON, and LAWSON, JJ., concur.
PARIENTE, J., concurs in result with an opinion, in which LEWIS, J., concurs.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.

PARIENTE, J., concurring in result.

I agree with the majority that "Judge Decker's misconduct unquestionably warrants the imposition of a serious sanction." Majority op. at 35. I also agree

- 38 -

with the increase of sanctions from the JQC's recommended 90-day suspension without pay to a six-month suspension without pay. The increase in sanctions is appropriate given the seriousness of the multiple charges against Judge Decker, which would have warranted a rehabilitative suspension.[9] As the JQC found, the "cumulative effect of these misdeeds coupled with the fact that Judge Decker had been reprimanded by [T]he Florida Bar in the past, evinces a lack of ability to identify situations that lead to the appearance of impropriety."

Although I agree with the sanctions the majority imposes, as I explain in further detail below, I cannot agree with the majority that consolidated Charge 8 found by the JQC, relating to prohibited communication with a represented party, "is not supported by the evidence." Majority op. at 31. Accordingly, I concur in result because I disagree with the majority's rejection of that charge.

I would not reject the JQC's findings regarding consolidated Charge 8, which relates to then-attorney Decker's prohibited communication with a

_____

9. With a rehabilitative suspension, when an attorney is suspended for a period of time of more than ninety days but less than three years, the attorney is required to petition The Florida Bar for readmission to practice law and "shall require proof of rehabilitation." Std. 2.3, Fla. Std. for Imposing Lawyer Sanctions, The Florida Bar (last updated May 2015). If he had been under a rehabilitative suspension, Judge Decker would have been ineligible to become a judge unless he had been readmitted to the practice of law. See In re Advisory Op. to Governor re Comm'n of Elected Judge, 17 So. 3d 265, 267 (Fla. 2009) (explaining that "a lawyer who is suspended from the practice of law fails to satisfy the constitutional eligibility requirements for a circuit court judgeship").

represented party, Job White, during "secret meetings" between then-attorney Decker's clients, Jennifer and Matthew Ellison, and Job White. As the JQC found, then-attorney Decker's clients were defendants in a foreclosure action brought by Compass Bank. In June 2014, then-attorney Decker "served an answer on Brent C. Siegel . . . who represented Fred and Kelly Shore, Ted Burt, and Job White and his wife, Frances Grace White, and various entities in which Burt and Shore were involved." Some of these parties who Seigel represented "were actively involved in efforts to reinstate, refinance, or even buy the Compass Bank loan, probably through a third party, in an effort to save the condominium project for which the loan was made." Unknown to Siegel's clients, however, is that in October 2014 "the Ellisons began their own discussions and negotiations with Compass Bank to buy the loan for their own benefit," thereby becoming competitors with Siegel's clients seeking to purchase the Compass Bank loan.

The JQC found that, in attempting to purchase the Compass Bank loan, then-attorney Decker and Jennifer Ellison, also a lawyer, "met in secret" with Job White. The purpose of the meeting was "to discuss a possible settlement of the Compass Bank case as to the Whites only. Pursuant to this settlement the Whites would provide funds that the Ellisons would use to help them buy the Compass loan, and, if the Ellisons were successful in doing so, the Ellisons as the new owners of the Compass loan, would dismiss all claims against the Whites." When

then-attorney Decker met with Job White, he knew that the Whites already had counsel, Siegel, who had not sought or been given leave to withdraw from representing the Whites. Nonetheless, one day after the initial "secret meeting" between the Whites, the Ellisons, and then-attorney Decker, "a deal was reached, was reduced to writing and was executed."

Judge Decker's defense to his actions, which the majority accepts, is that White told then-attorney Decker he was no longer represented by counsel. But, then-attorney Decker knew White had been represented by Siegel. Indeed, then-attorney Decker had "served an answer on" Siegel in the ongoing litigation just four months prior to secretly meeting with White. After then-attorney Decker was informed by Job White that he was not represented in forming the secret agreement, then-attorney Decker made no attempt to verify whether the Whites had indeed discharged Siegel or whether Siegel had filed a motion to withdraw with the circuit court. Siegel did not learn of the secret agreement that his clients had entered into with then-attorney Decker's client for more than a month after it was executed. In fact, as the JQC noted, the settlement agreement between the Ellisons and the Whites contained, in "an apparent effort to protect the secrecy of the settlement," a confidentiality provision which stated "that the parties shall not disclose the terms of the agreement except to their respective legal counsel." This provision makes little sense if Job White was no longer represented by Siegel.

Indeed, Siegel testified at the JQC hearing that he was still representing the Whites when then-attorney Decker met with Job White, did not give any consent to then-attorney Decker to meet with his client, and that he was "stunned" when he learned of the "secret meeting."

The majority excuses this violation by stating that a "party who like White has decided that he no longer desires to be represented by counsel should not be chained to counsel for purposes of Rule of Professional Conduct 4-4.2(a) until counsel withdraws under Florida Rule of Judicial Administration 2.505(f)(1)." Majority op. at 32. However, as the JQC's finding reflects, after a party claims he or she has discharged counsel of record, there are important reasons to verify with the counsel of record that counsel has, in fact, been discharged or has withdrawn. In fact, in this case, there appears to be a factual dispute as to whether White had actually discharged Siegel from representation.

We have emphasized the utmost importance of this verification in criminal cases. See The Florida Bar v. Feinberg, 760 So. 2d 933, 939-40 (Fla. 2000) (holding that a prosecutor's actions in meeting with a defendant who had counsel after the defendant told the prosecutor he had discharged his counsel "cast a shadow over the integrity of our adversarial system," and explaining "that attorneys must be extremely cautious in determining whether to speak with an individual who appears to be represented by counsel"). While the stakes are

different in a civil matter, the importance of confirming with opposing counsel that counsel has actually withdrawn or has been discharged before proceeding to meet with the formerly represented party ensures that a shadow is not cast over the integrity of our adversarial system.

According to Florida Rule of Professional Conduct 4-4.2(a), "a lawyer must not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter." The comment to Rule 4-4.2 further provides, "This means that the lawyer has actual knowledge of the fact of the representation; but such actual knowledge may be inferred from the circumstances. . . . Thus, the lawyer cannot evade the requirement of obtaining the consent of counsel by closing eyes to the obvious."

In this case, Judge Decker alleges that he had "actual knowledge" that White was not represented because White personally advised him of that fact. Yet, this was not the full extent of then-attorney Decker's knowledge about White's representation. Then-attorney Decker also knew that White had been previously represented in the litigation. Furthermore, as the JQC found, the settlement agreement between the parties provided that the terms of the agreement could only be discussed with legal counsel. White would have no need for a provision allowing him to inform counsel of the settlement agreement if he did not already have counsel. Therefore, especially in the context of these "secret meetings,"

which could have undermined Siegel's other clients who also sought to purchase the Compass Bank loan, Judge Decker should not be shielded from professional responsibility by "closing [his] eyes to the obvious."  Judge Decker was not cautious in this regard, and his good intentions pertaining to his clients do not overcome the harm that is, or can be, occasioned by meeting with someone who is represented by counsel without counsel's permission during ongoing litigation.

Lastly, Judge Decker's ethical missteps as an attorney, in my view, are compounded by the false and otherwise unethical statements he made on the campaign trail.  First, he stated "at a televised debate that he had never been accused of a conflict of interest."  Majority op. at 12.  This was false, as "less than four months earlier, a formal complaint was filed with The Florida Bar by Daniel Dukes, a former client [of then-attorney Decker's], alleging conflict of interest."  Id. at 3.  Then-attorney Decker knew that he had been previously accused of a conflict of interest because he had "responded to that complaint with a twelve-page letter only two and one half months before the debate."  Id.  While Judge Decker admitted his guilt as to this misconduct, he has, as the JQC noted in its findings, maintained his "steadfast position that he has done nothing wrong."

Additionally, while campaigning for his judicial seat, then-attorney Decker affiliated himself with the Republican Party.  At a judicial forum sponsored by the Lafayette County Republican Executive Committee, then-attorney Decker stated to

the audience that he is a registered Republican and that his former affiliation with the Democratic Party "was an error." Id. at 4. I agree with the majority that this conduct "was also proven and violated Canon 7C(3) of the Code of Judicial Conduct," as well Rule 4-8.2(b) and section 105.071(3), Florida Statutes. Majority op. at 20-21.

This Court has "often pointed out that judges should be held to higher ethical standards than lawyers by virtue of their position in the judiciary and the impact of their conduct on public confidence in an impartial justice system." In re McMillian, 797 So. 2d 560, 571 (Fla. 2001). Boldly stating that one is a member of a political party while campaigning for a nonpartisan judicial office and misrepresenting to voters one's record on ethics is discordant with the "high standard of ethical and professional conduct" required of judges. In re Murphy, 181 So. 3d 1169, 1177 (Fla. 2015).

Unlike past instances when this Court has removed a judge from the bench, however, Judge Decker's conduct is not so "fundamentally inconsistent with the responsibilities of judicial office" as to erode confidence in the judiciary and thereby necessitate removal. Id. at 1179. For all these reasons, I concur in the strong message this Court sends by imposing a six-month suspension without pay and a public reprimand. As the JQC remarked, "it is imperative that Judge Decker spend a period of time reflecting upon the far-reaching consequences of his

actions." Unfortunately, this suspension will negatively affect the other judges of the Third Judicial Circuit, who will have to absorb Judge Decker's workload. However, the purpose of the JQC proceedings is to "gauge a judge's fitness to serve," majority op. at 37, and by all accounts, despite his professional misconduct as an attorney, Judge Decker has ably served the citizens of the Third Judicial Circuit since assuming the bench. The sanction this Court imposes ensures that the Third Judicial Circuit will not be deprived of Judge Decker's judicial service on a permanent basis.

LEWIS, J., concurs.

Original Proceeding – Judicial Qualifications Commission

Judge Kerry I. Evander, Chair, Ricardo Morales, III, Past Chair, and Michael Louis Schneider, Executive Director and General Counsel, Tallahassee, Florida; Fred Wallace Pope, Jr., Special Counsel, Johnson, Pope, Bokor, Ruppel & Burns, LLP, Clearwater, Florida; Judge Krista Marx, Chair of the Hearing Panel, Palm Beach Gardens, Florida; and John R. Beranek, Counsel to the Hearing Panel, Ausley & McMullen, Tallahassee, Florida,

     for Florida Judicial Qualifications Commission, Petitioner

Andrew Joseph Decker, IV of The Decker Law Firm, P.A., Live Oak, Florida, and Scott Kevork Tozian and Gwendolyn H. Daniel of Smith, Tozian, Daniel & Davis, P.A., Tampa, Florida,

     for Judge Andrew J. Decker, III, Respondent